**Margaret BEAN et al., Plaintiffs,**

v.

**SOUTHWESTERN WASTE MANAGEMENT CORP. et al., Defendants.**

**Civ. A. No. H–79–2215.**

United States District Court,
S. D. Texas,
Houston Division.

Dec. 21, 1979.

Linda McKeever Bullard, Houston, Tex., for plaintiffs.

Sim Lake, Fulbright & Jaworski, Houston, Tex., Thomas F. Aubry, Asst. Atty. Gen., Houston, Tex., for defendants.

## MEMORANDUM OPINION AND ORDER

McDONALD, District Judge.

### I.

### INTRODUCTION

Between November 7 and 28, 1979, the Court conducted an eleven (11) day hearing on the plaintiffs' Motion for Preliminary Injunction.[1] The Court has carefully considered the post-hearing briefs and the arguments of counsel and examined in detail the exhibits offered, many of which contain considerable statistical data. For the reasons stated in this Memorandum Opinion and Order, the plaintiffs' Motion for Preliminary Injunction is denied.

On October 26, 1979, plaintiffs filed their complaint and Motion for Temporary Restraining Order and Preliminary Injunc-

1. Approximately twenty-five witnesses testified and eighty exhibits were received into evidence.

tion[2] contesting the decision by the Texas Department of Health to grant Permit No. 1193 to defendant Southwestern Waste Management to operate a Type I solid waste facility in the East Houston-Dyersdale Road area in Harris County.[3] They contend that the decision was, at least in part, motivated by racial discrimination in violation of 42 U.S.C. § 1983 and seek an order revoking the permit. The defendants deny the allegations and have moved to dismiss this case on the grounds of abstention, laches, and the absence of state action.[4] They also complain of the failure of the plaintiffs to name the Texas Department of Water Resources as a defendant. The Court will first address the Motions to Dismiss and procedural matters raised by the defendants and then discuss the Motion for a Preliminary Injunction.

## II.

## ABSTENTION

The defendants have requested the Court to abstain from this case because the plaintiffs have failed to avail themselves of procedures available under state law. More specifically, they point to the failure of the plaintiffs to petition the Texas Department of Health (TDH) for a rehearing on the granting of the permit pursuant to the Solid Waste Disposal Act. *Tex.Rev.Civ.Stat. Ann.*, art. 4477–7, § 4(e)(8). Having reviewed both the law and the record, the Court is convinced that abstention would be inappropriate in this case. The Solid Waste Disposal Act permits revocation of a permit on rehearing only for "reasons pertaining to public health, air or water pollution, land use, or violation of this Act or of any other applicable laws or regulations controlling

2. Plaintiffs subsequently filed two Amended Complaints clarifying the jurisdictional bases upon which they relied and the parties they intended to name as defendants.

3. The entrance to this proposed facility is located in the City of Houston, but the major portion of the facility is outside the city limits of Houston, located in Harris County.

4. The Directors of Harris County Health Department and City of Houston Health Depart-

the disposal of solid waste." *Tex.Rev.Civ. Stat.Ann.*, art. 4477–7, § 4(e)(8). Those are not the reasons for which the plaintiffs seek revocation. They seek revocation for an alleged violation of 42 U.S.C. § 1983. In addition, witnesses on behalf of TDH indicated that that agency in keeping with its statutory authority, would not examine allegations of racial discrimination in site selection. Since that is what the plaintiffs allege, it would be useless to refer them back to TDH.

## III.

## LACHES

The defendants have also moved to dismiss on the basis of the equitable doctrine of laches. The evidence adduced at the hearing established that laches is not applicable to this case. Three independent criteria must be established before laches can be applied. "The defendant must show: (1) a delay in asserting a right or claim; (2) that the delay was not excusable; and (3) that there was undue prejudice to the party against whom the claim is asserted." *Save Our Wetlands v. U. S. Army Corps of Engineers*, 549 F.2d 1021, 1026 (5th Cir.), *cert. denied*, 434 U.S. 836, 98 S.Ct. 126, 54 L.Ed.2d 98 (1977). Although the site being challenged here is very near completion and a public hearing, which was well attended, was held on the permit application, the Court fully believes that the plaintiffs in this case did not know about the placement of the site until quite recently. Furthermore, the Court does not believe that the plaintiffs' failure to learn about the site location earlier is so inexcusable that they should be prevented from seeking

ment were dismissed as parties defendant by order of December 5, 1979. Harris County Health Department, City of Houston Health Department, and Texas Department of Health were dismissed as parties defendant by Order of December 6, 1979. By Order of December 14, 1979, Oak Glen Building Company was dismissed from the action. Only the Commissioner of TDH and the private parties remain as defendants.

judicial relief.[5] In short, the plaintiffs did not sleep on their rights. Their delay must be considered, in terms of the *Save Our Wetlands, supra,* criteria, "excusable."

## IV.

### STATE ACTION

■ The defendants' third proposed ground for dismissal is the absence of state action. There is no absence of state action in this case. The plaintiffs are contesting the granting of a permit by the Texas Department of Health. That is state action, pure and simple. *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). If TDH either discriminated on its own or endorsed or ratified discriminatory acts of the other defendants, the plaintiffs are entitled to relief. Further discovery may reveal that Southwestern Waste Management Corp. (SWW) and Browning-Ferris Industries, Inc. (BFI) were not so intertwined with the state that their actions should be considered actions of the state, but that would only require dismissal against SWW and BFI. State action would still be present and a cause of action would still remain against defendant Moore, Commissioner of TDH. Whatever the involvement of SWW and BFI, the Court would still be required to address the merits of this claim.

## V.

### THE TEXAS DEPARTMENT OF WATER RESOURCES

■ Before getting to the merits, the Court must address one other procedural matter. The plaintiffs did not name the Texas Department of Water Resources (TDWR) as a defendant in this case. That, of course, is not particularly surprising.

That agency did not participate in the decision to grant Permit No. 1193 and nothing it did with respect to the issuance of that permit is being challenged here. The plaintiffs have, however, submitted a large quantity of data related to solid waste sites in Houston operating under the auspices of TDWR and a dispute has arisen as to the relevance of this data. The Court is of the opinion that the evidence as to TDWR's actions is entirely irrelevant to the question of whether it was an historical policy or practice of TDH to discriminate, since TDH should not be held responsible for the commission of acts, e. g., issuance of permits by TDWR, over which it had no control. Evidence as to TDWR's action is relevant, however, to the question of whether TDH, being aware of the placement of solid waste sites throughout the city of Houston, if it was so aware, discriminated by approving the permit for the East Houston-Dyersdale Road site, since a state agency must not put its stamp of approval on a discriminatory practice or policy even if it did not initiate the practice or policy. *Shelley v. Kraemer,* 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948).

## VI.

### THE PRELIMINARY INJUNCTION

■ There are four prerequisites to the granting of a preliminary injunction. The plaintiffs must establish: (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury, "(3) that the threatened injury to the plaintiff[s] outweighs the threatened harm the injunction may do to defendant[s], and (4) that granting the preliminary injunction will not disserve the public interest." *Canal Authority of State of Florida v. Callaway,* 489 F.2d 567, 572 (5th Cir. 1974).

---

**5.** There was considerable testimony that the plaintiffs were told and believed a shopping center or steel mill was being constructed. Photographs were introduced that clearly showed that a passerby would not be able to discern that a land fill was under construction. Further, when plaintiffs learned that a land fill site was under construction they organized,

circulated petitions signed by hundreds of persons, and raised funds to oppose this construction. In light of this vociferous opposition it appears clear that if they had known about the proposed site earlier, the plaintiffs would not have hesitated to take the same type of concerted action.

■ The plaintiffs have adequately established that there is a substantial threat of irreparable injury. They complain that they are being deprived of their constitutional rights. That, in itself, may constitute irreparable injury, *Henry v. Greenville Airport Commission,* 284 F.2d 631, 633 (4th Cir. 1960); *see Ethridge v. Rhodes,* 268 F.Supp. 83, 88–89 (S.D.Ohio, E.D.1967), but more is present here. The opening of the facility will affect the entire nature of the community—its land values, its tax base, its aesthetics, the health and safety of its inhabitants, and the operation of Smiley High School, located only 1700 feet from the site. Damages cannot adequately compensate for these types of injuries. Similarly, if a substantial likelihood of success on the merits were shown, there is no doubt that the threatened injury to the plaintiffs would outweigh that to the defendants and that the public interest would not be disserved by granting the plaintiffs an injunction.

■ The problem is that the plaintiffs have not established a substantial likelihood of success on the merits. The burden on them is to prove discriminatory purpose. *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976); *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). That is, the plaintiffs must show not just that the decision to grant the permit is objectionable or even wrong, but that it is attributable to an intent to discriminate on the basis of race. Statistical proof can rise to the level that it, alone, proves discriminatory intent, as in *Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886), and *Gomillion v. Lightfoot,* 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960), or, this Court would conclude, even in situations less extreme than in those two cases, but the data shown here does not rise to that level. Similarly, statistical proof can be sufficiently supplemented by the types of proof outlined in *Arlington Heights, supra,* to establish purposeful discrimination, but the supplemental proof offered here is not sufficient to do that.

Two different theories of liability have been advanced in this case. The first is that TDH's approval of the permit was part of a pattern or practice by it of discriminating in the placement of solid waste sites. In order to test that theory, one must focus on the sites which TDH has approved and determine the minority population of the areas in which the sites were located on the day that the sites opened. The available statistical data, both city-wide and in the target area, fails to establish a pattern or practice of discrimination by TDH. City-wide, data was produced for the seventeen (17) sites operating with TDH permits as of July 1, 1978. Defendants' Exhibit 21. That data shows that 58.8% of the sites granted permits by TDH were located in census tracts with 25% or less minority population at the time of their opening and that 82.4% of the sites granted permits by TDH were located in census tracts with 50% or less minority population at the time of their opening. In the target area, an area which roughly conforms to the North Forest Independent School District and the newly-created City Council District B and is 70% minority in population, Plaintiffs' Exhibit 2, two (2) sites were approved by TDH. One, the McCarty Road site, was in a census tract with less than 10% minority population at the time of its opening. The other, the site being challenged here, is in a census tract with close to 60% minority population. Defendants' Exhibit 20. Even if we also consider the sites approved by TDWR in the target area, which, as discussed earlier, are not really relevant to TDH's intent to discriminate, no pattern or practice of discrimination is revealed. Of all the solid waste sites opened in the target area, 46.2 to 50% were located in census tracts with less than 25% minority population at the time they opened. Defendants' Exhibit 20 and Plaintiffs' Exhibit 48. It may be that more particularized data would show that even those sites approved in predominantly Anglo census tracts were actually located in minority neighborhoods, but the data available here does not show that. In addition, there was no supplemental evidence, such as that suggested by *Arlington Heights,*

*supra,* which established a pattern or practice of discrimination on the part of TDH.

The plaintiffs' second theory of liability is that TDH's approval of the permit, in the context of the historical placement of solid waste sites and the events surrounding the application, constituted discrimination. Three sets of data were offered to support this theory. Each set, at first blush, looks compelling. On further analysis, however, each set breaks down. Each fails to approach the standard established by *Yick Wo, supra,* and *Gomillion, supra,* and, even when considered with supplementary proof, *Arlington Heights, supra,* fails to establish a likelihood of success in proving discriminatory intent.

The first set of data focuses on the two (2) solid waste sites to be used by the City of Houston. Both of these sites are located in the target area. This proves discrimination, the plaintiffs argue, because "the target area has the dubious distinction of containing 100% of the type I municipal land fills that Houston utilizes or will utilize, although it contains only 6.9% of the entire population of Houston." *Plaintiff's Brief* at 7. There are two problems with this argument. First, there are only two sites involved here. That is not a statistically significant number. Second, an examination of the census tracts in the target area in which the sites are located reveals that the East Houston-Dyersdale Road proposed site is in a tract with a 58.4% minority population, but that the McCarty Road site is in a tract with only an 18.4% minority population. Thus, the evidence shows that, of the two sites to be used by the City of Houston, one is in a primarily Anglo census tract and one is in a primarily minority census tract. No inference of discrimination can be made from this data.

The second set of data focuses on the total number of solid waste sites located in

the target area.[6] The statistical disparity which the plaintiffs point to is that the target area contains 15% of Houston's solid waste sites, but only 6.9% of its population. Since the target area has a 70% minority population, the plaintiffs argue, this statistical disparity must be attributable to race discrimination. To begin with, in the absence of the data on population by race, the statistical disparity is not all that shocking. One would expect solid waste sites to be placed near each other and away from concentrated population areas. Even considering the 70% minority population of the target area, when one looks at where in the target area these particular sites are located, the inference of racial discrimination dissolves. Half of the solid waste sites in the target area are in census tracts with more than 70% Anglo population. Defendants' Exhibit 20. Without some proof that the sites affect an area much larger than the census tract in which they are in, it is very hard to conclude that the placing of a site in the target area evidences purposeful racial discrimination.

The third set of data offered by the plaintiffs focuses on the city as a whole. Plaintiffs' Exhibit 16 and Defendants' Exhibit 30. This data is the most compelling on its surface. It shows that only 17.1% of the city's solid waste sites are located in the southwest quadrant, where 53.3% of the Anglos live. Only 15.3% of the sites are located in the northwest quadrant, where 20.1% of the Anglos live. Thus, only 32.4% of the sites are located in the western half of the city, where 73.4% of the Anglos live. Furthermore, the plaintiffs argue, 67.6% of the sites are located in the eastern half of the city, where 61.6% of the minority population lives.[7] This, according to the plaintiffs, shows racial discrimination.

The problem is that, once again, these statistics break down under closer scrutiny.

---

**6.** It should be noted that there are some problems with the definition of the target area as selected and defined by the plaintiffs. There is some question as to whether the definition of the area was entirely scientific. Even so, the approach is a useful one and the target area data should be examined.

**7.** The defendants quarrel with this proposition. They say that the data shows that 64.1% of the solid waste sites are located in the eastern half of the city and that 62.8% of its minority population lives there.

To begin with, the inclusion of TDWR's sites skew the data. A large number of TDWR sites are located around Houston's ship channel, which is in the eastern half of the city. But those sites, the Assistant Attorney General argues persuasively, are located in the eastern half of the city because that is where Houston's industry is, not because that is where Houston's minority population is. Furthermore, closer examination of the data shows that the city's solid waste sites are not so disparately located as they first appear. If we focus on census tracts, rather than on halves or quadrants of the city, we can see with more particularity where the solid waste sites are located. Houston's population is 39.3% minority and 60.7% Anglo. Plaintiffs' Exhibit 16. The plaintiffs argue, and this Court finds persuasive, a definition of "minority census tracts" as those with more than 39.3% minority population and Anglo census tracts as those with more than 60.7% Anglo population. Using those definitions, Houston consists of 42.5% minority tracts and 57.5% Anglo tracts. Plaintiffs' Exhibit 16. Again using those definitions, 42.3% of the solid waste sites in the City of Houston are located in minority tracts and 57.7% are located in Anglo tracts. Defendants' Exhibit 30; Plaintiffs' Exhibits 41, 48, and 49. In addition, if we look at tracts with one or more sites per tract, to account for the fact that some tracts contain more than one solid waste site, 42.2% are minority tracts and 57.8% are Anglo tracts. Defendants' Exhibit 30, Plaintiffs' Exhibits 41, 48 and 49. The difference between the racial composition of census tracts in general and the racial composition of census tracts with solid waste sites is, according to the statistics available to the Court, at best, only 0.3%. That is simply not a statistically significant difference. More surprisingly, from the plaintiffs' point of view, to the extent that it is viewed as significant, it tends to indicate that minority census tracts have a tiny bit smaller percentage of solid waste sites than one would proportionately expect.

In support of the proposition that there is a city-wide discrimination against minorities in the placement of solid waste sites, the plaintiffs also argue that the data reveals that, in 1975, eleven solid waste sites were located in census tracts with 100% minority population and none were located in census tracts with 100% Anglo population. *Plaintiffs' Brief* at 8. There are problems with this argument, too, however. To begin with, the 1975 data is not entirely reliable. Compared with both the 1970 and the 1979 data, the 1975 data appears to overcount minority population. Plaintiffs' Exhibit 41. For example, of the eleven sites mentioned by the plaintiffs, only one had a 100% minority population in 1979. Plaintiffs' Exhibit 41. More importantly, there were, in fact, two sites located in 100% Anglo tracts in 1975. In addition, 18 other sites were located in tracts with a 90% or greater Anglo population in 1975. Thus, even according to the 1975 data, a large number of sites were located in census tracts with high Anglo populations.

*Arlington Heights, supra,* 429 U.S. at 267–268, 97 S.Ct. at 564–565, suggested various types of non-statistical proof which can be used to establish purposeful discrimination. The supplementary non-statistical evidence provided by the plaintiffs in the present case raises a number of questions as to why this permit was granted. To begin with, a site proposed for the almost identical location was denied a permit in 1971 by the County Commissioners, who were then responsible for the issuance of such permits. One wonders what happened since that time. The plaintiffs argue that Smiley High School has changed from an Anglo school to one whose student body is predominantly minority. Furthermore, the site is being placed within 1700 feet of Smiley High School, a predominantly black school with no air conditioning, and only somewhat farther from a residential neighborhood. Land use considerations alone would seem to militate against granting this permit. Such evidence seemingly did not dissuade TDH.

If this Court were TDH, it might very well have denied this permit. It simply does not make sense to put a solid waste site so close to a high school, particularly

one with no air conditioning. Nor does it make sense to put the land site so close to a residential neighborhood. But I am not TDH and for all I know, TDH may regularly approve of solid waste sites located near schools and residential areas, as illogical as that may seem.

■ It is not my responsibility to decide whether to grant this site a permit. It is my responsibility to decide whether to grant the plaintiffs a preliminary injunction. From the evidence before me, I can say that the plaintiffs have established that the decision to grant the permit was both unfortunate and insensitive. I cannot say that the plaintiffs have established a substantial likelihood of proving that the decision to grant the permit was motivated by purposeful racial discrimination in violation of 42 U.S.C. § 1983. This Court is obligated, as all Courts are, to follow the precedent of the United States Supreme Court and the evidence adduced thus far[8] does not meet the magnitude required by *Arlington Heights, supra.*

### VII.

### PERMANENT RELIEF

The failure of the plaintiffs to obtain a preliminary injunction does not, of course, mean that they are foreclosed from obtaining permanent relief. Because of the time pressures involved, extensive pre-trial discovery was impossible in this case. Assuming the case goes forward, discovery could lead to much more solid and persuasive evidence for either side. Ideally, it would resolve a number of the questions which the Court considers unanswered.

Where, for instance, are the solid waste sites located in each census tract? The plaintiffs produced evidence that in census tract 434, a predominantly Anglo tract, the site was located next to a black community named Riceville. If that was true of most sites in predominantly Anglo census tracts, the outcome of this case would be quite different.

How large an area does a solid waste site affect? If it affects an area a great deal smaller than that of a census tract, it becomes particularly important to know where in each census tract the site is located. If it affects an area larger than that of a census tract, then a target area analysis becomes much more persuasive.

How are solid waste site locations selected?[9] It may be that private contractors consider a number of alternative locations and then select one in consultation with city or county officials. If that is so, it has tremendous implications for the search for discriminatory intent. It may be that a relatively limited number of areas can adequately serve as a Type I solid waste site. If that is so, the placement of sites in those areas becomes a lot less suspicious, even if large numbers of minorities live there. Either way, this is information which should be adduced. At this point, the Court still does not know how, why, and by whom the East Houston-Dyersdale Road location was selected.

What factors entered into TDH's decision to grant the permit?[10] The proximity of the site to Smiley High School and a residential neighborhood and the lack of air conditioning facilities at the former were emphasized to the Court. It is still unknown how much, if any, consideration TDH gave to these factors. The racial composition of the neighborhood and the racial distribution of solid waste sites in Houston were primary concerns of the plaintiffs. It remains unclear to what degree TDH was informed of these concerns.

---

**8.** All parties, particularly counsel for the plaintiffs, operating under the limitations of an absence of extensive discovery because of the emergency nature of this proceeding and thus, time constraints, did a remarkable job of garnering the facts to present to the Court.

**9.** It should be noted that no representative of Southwestern Waste Management Corporation testified during this hearing.

**10.** The TDH hearing examiner was not called to testify, nor did this Court receive into evidence his written findings, if they were made, as appears to be the usual procedure.

## VIII.

### CONCLUSION

At this juncture, the decision of TDH seems to have been insensitive and illogical. Sitting as the hearing examiner for TDH, based upon the evidence adduced, this Court would have denied the permit. But this Court has a different role to play, and that is to determine whether the plaintiffs have established a substantial likelihood of proving that TDH's decision to issue the permit was motivated by purposeful discrimination in violation of 42 U.S.C. § 1983 as construed by superior courts. That being so, it is hereby ORDERED, ADJUDGED, and DE-CREED that the plaintiffs' Motion for a Preliminary Injunction be, and the same is, DENIED. For the reasons stated above, the defendants' Motions to Dismiss are also DENIED.