**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

SYLVIA DARENSBURG; VIVIAN HAIN,
on behalf of themselves and others
similarly situated; AMALGAMATED
TRANSIT UNION, LOCAL 192;
COMMUNITIES FOR A BETTER
ENVIRONMENT,
   *Plaintiffs-Appellants,*

  and

VIRGINIA MARTINEZ,
       *Plaintiff,*

  v.

METROPOLITAN TRANSPORTATION
COMMISSION,
   *Defendant-Appellee.*

No. 09-15878

D.C. No.
3:05-cv-01597-EDL

OPINION

Appeal from the United States District Court
for the Northern District of California
Elizabeth D. Laporte, Magistrate Judge, Presiding

Argued and Submitted
January 14, 2011—San Francisco, California

Filed February 16, 2011

Before: J. Clifford Wallace, John T. Noonan, and
Barry G. Silverman, Circuit Judges.

Opinion by Judge Silverman;
Concurrence by Judge Noonan

2553

## COUNSEL

Linda Lye (argued), Peter D. Nussbaum, P. Casey Pitts, and Daniel Purtell of Altschuler Berzon LLP, San Francisco, California; Bill Lann Lee, Margaret Hasselman, Angelica Kristen Jongco, and Sacha C. Steinberger of Lewis Feinberg Lee Renaker & Jackson, PC, Oakland, California; Matthew Brigham, Heather Dunn Navarro, Brandon Kimura, Neha M. Marathe, and Jessica Valenzuela Santamaria, Cooley LLP; Richard A. Marcantonio, Jr. and Guillermo Mayer of Public Advocates, Inc., San Francisco, California; and Adrienne Bloch of Communities for a Better Environment, Oakland, California, for appellants.

Kimon Manolius (argued), Julia H. Veit, Warren Richmond Webster, Megan O. Thompson, and Emily M. Charley of Hanson Bridgett LLP, San Francisco, California; Francis F. Chin, Cynthia E. Segal of Metropolitan Transportation Commission, Oakland, California, for appellees.

## OPINION

SILVERMAN, Circuit Judge:

Plaintiffs-appellants, a class of members of racial minority groups who ride buses operated by the Alameda-Contra Costa Transit District ("AC Transit"), a labor union, and a community-based organization appeal from the district court's judgment in favor of the Metropolitan Transportation Commission. Claiming state and federal civil rights violations, Plaintiffs allege that MTC's disproportionate emphasis on rail expansion projects over bus expansion projects in its Regional Transit Expansion Plan, also known as the RTEP, illegally discriminates against minorities, who constitute 66.3% of San Francisco Bay Area bus riders — even though 51.6% of rail riders are also members of racial minority groups.

Plaintiffs claim that the RTEP has a disparate impact on minorities, and that this disparate impact, along with evidence of (1) the history of Bay Area rail service as predominantly benefitting white riders; (2) MTC's interactions with its advisory committees representing minority groups; and (3) MTC's inconsistent application of selection criteria to bus and rail projects, demonstrates that MTC's decision to favor rail over bus expansion in the RTEP results from intentional discrimination.

The district court granted summary judgment in favor of MTC on Plaintiffs' intentional discrimination claims, but allowed the disparate impact claims to continue to trial. After trial, the district court held that Plaintiffs had established a prima facie case of disparate impact discrimination only as to MTC's conduct in disproportionately selecting and allocating funding to rail projects, as opposed to bus projects, in the RTEP. However, shifting the burden to MTC, the district court held that MTC had shown "substantial legitimate justification" for its challenged conduct. Shifting the burden back to Plaintiffs to prove the existence of a less discriminatory,

equally effective alternative, the district court held that they had failed to do so.

We agree that Plaintiffs' disparate impact claim fails, but for a different reason. The statistical measure upon which Plaintiffs relied to establish a prima facie case is unsound, and their claim rests upon a logical fallacy. Although Plaintiffs' statistical evidence shows that minorities make up a greater percentage of the regional population of bus riders than rail riders, it does not necessarily follow that an expansion plan that emphasizes rail projects over bus projects will harm minorities. Plaintiffs' theory forecloses altogether the possibility that MTC could devise *any* rail-centered expansion that could benefit minority transit riders, while the evidence shows that Bay Area minorities already benefit substantially from rail service. Without a more precise statistical measure of how the particular projects included in the RTEP will serve the Bay Area's transit ridership, no court could possibly determine whether MTC's long-term expansion plan will help or harm the region's minority transit riders.

Because Plaintiffs do not establish a prima facie case of disparate impact, MTC is not required to justify its challenged conduct, and we do not address the district court's analysis on that point.

Plaintiffs' failure to provide an appropriate measure of disparate impact also fatally undermines their claim of intentional discrimination. Not only does Plaintiffs' statistical evidence fail to prove discrimination, but their circumstantial evidence does not support any inference that MTC's adoption of the Regional Transit Expansion Plan was motivated by racial bias.

We affirm the judgment of the district court.

### FACTUAL BACKGROUND

The facts of this case are set forth in exquisite detail by the district court in its decision, *see Darensburg v. Metro. Transp.*

*Comm'n*, 611 F. Supp. 2d 994 (N.D. Cal. 2009); therefore, we repeat only those facts pertinent to the issues we address in detail.

## I.  Parties

MTC is the transportation planning, coordinating and financing agency for the nine-county San Francisco Bay Area. MTC is the designated recipient of numerous federal and state funding sources, and is responsible for allocating those funding sources that are within its control to various transit operators and projects. MTC sets policy and makes funding decisions through its nineteen-member Board of Commissioners.

There are twenty-six independent transit operators within MTC's purview. The operators are independent from MTC and make their own decisions about budgeting and policy, including what services to provide. The operators are funded in part with state and federal money allocated through MTC; however, operators also receive a substantial part of their funding from state and local revenue sources, such as local sales taxes, that are outside of MTC's control.

Plaintiffs rely on AC Transit bus service for transportation to and from work, school, shopping, and family and social engagements, among other destinations. Plaintiffs allege they have been harmed by cuts in AC Transit's bus service, fare hikes, failure to make improvements that would make buses more accessible and service more reliable, and failure to increase the reach and frequency of bus service. As a result, Plaintiffs claim to have lost out on job opportunities; been forced to cut expenses for other necessities to accommodate fare hikes; used more expensive means of transportation, including cars and taxis, to work around service shortages; and been subject to long waits for buses in unsafe areas.

Plaintiffs assert that MTC's decisions not to select more and allocate greater funding for bus expansion projects in its

Regional Transit Expansion Plan has caused, at least in part, the fare hikes, service shortages, and lack of improvement on AC Transit bus service of which Plaintiffs complain.

## II.  Transit Operators and Regional Ridership Demographics

Seven operators account for over ninety-five percent of the Bay Area's transit trips. The annual ridership of these seven operators for fiscal-year 2005-06 was approximately as follows: (1) San Francisco Municipal Railway ("MUNI") (220.880 million riders); (2) Bay Area Rapid Transit ("BART") (101.578 million riders); (3) AC Transit (65.383 million riders); (4) Santa Clara Valey Transit Authority ("VTA") (40.187 million riders); (5) San Mateo County Transit District ("SamTrans") (40.187 million riders); (6) Peninsula Corridor Joint Powers Board ("CalTrain") (10.149 million riders); and (7) Golden Gate Highway and Transporation District ("GGT") (9.403 million riders). The percentage of minority ridership on these operators is as follows: (1) AC Transit (78%); (2) VTA (70%); (3) SamTrans (70%); (4) MUNI (58%); (5) BART (53%); (6) Caltrain (50%); (7) GGT (38%). Minorities account for approximately 61 percent of the Bay Area's total transit ridership, 66.3 percent of bus ridership, and 51.6 percent of rail ridership.

These operators provide different and interconnecting modes of service. AC Transit and SamTrans provide only bus service. BART and Caltrain provide only rail service. MUNI and VTA provide a mix of bus and rail services. GGT provides a mix of bus and ferry services. AC Transit connects with nine other bus systems, twenty-one BART stations, six Amtrak stations, and three ferry terminals. BART operates five routes to forty-three stations in four counties, including areas served by AC Transit. Caltrain operates train service in San Francisco, San Mateo, and Santa Clara counties, and is run by a consortium of three other operators (MUNI, SamTrans, and VTA).

## III.   The Development of the Regional Transit Expansion Plan

MTC is responsible for updating roughly every four years the Regional Transportation Plan, a comprehensive blueprint for the development of mass transit, highway, airport, seaport, railroad, bicycle and pedestrian facilities. A key portion of the Regional Transportation Plan is the Regional Transit Expansion Plan, a long-range plan to address regional mass transit needs.

Plaintiffs challenge MTC's selection of projects for inclusion into the Regional Transit Expansion Plan, arguing that MTC favors rail expansion projects over bus expansion projects, and that this preference discriminates against bus riders who are disproportionately minority compared to rail riders. The RTEP at issue here was first adopted in 2001, and then amended and updated in 2006. Although the actionable conduct at issue arises from the 2006 amendment, most of the relevant background arises from the development and adoption of the 2001 RTEP.

### A.   Federal Guidelines for Regional Transit Planning

As the federally designated transit planning agency for the Bay Area,[1] MTC is mandated to "provide for consideration of projects and strategies that" serve a variety of goals, including (1) supporting regional "economic vitality"; (2) increasing "the safety and security of the transportation system"; (3) increasing "accessibility and mobility of people and for freight"; (4) supporting environmental protection, energy conservation, and planned growth and economic development patterns; (5) "enhanc[ing] the integration and connectivity of the transportation system, across and between modes, for peo-

---

[1]MTC functions as both the regional transportation planning agency — a state designation — and, for federal purposes, as the region's metropolitan planning organization.

ple and freight"; (6) "promot[ing] efficient system manage-
ment and operation"; and (7) "emphasiz[ing] the preservation
of the existing transportation system." 23 U.S.C § 134(h)(1).

The federal transportation agencies have also made equity
issues an important consideration in regional transportation
planning. In April 1997, the Department of Transportation
issued Order 5680.1,[2] requiring the Federal Transit Adminis-
tration and Federal Highway Administration to consider
human health and environmental effects related to transit proj-
ects that may have a "disproportionately high and adverse
effect on minority and low-income populations." The order
also requires the establishment of procedures "to provide
meaningful opportunities for public involvement by members
[of these populations] during the planning and development of
programs, policies, and activities (including the identification
of potential effects, alternatives, and mitigation measures)."
62 FR 18379.

**B.   Criteria for Evaluating Projects to Be Incorporated
        Into the RTEP**

In April 2001, MTC adopted Resolution 3357, a set of
financial and performance criteria under which projects pro-
posed for the Regional Transit Expansion Plan would be eval-
uated. Resolution 3357 identified two primary concerns
undergirding the RTEP: "[1] improving mobility in the Bay
Area's most congested travel corridors; and [2] providing
additional transit options for commuter travel." Resolution
3357 provided different but "roughly equivalent" criteria
under which rail expansion and bus expansion projects were
solicited and evaluated. These criteria included whether a
project (1) had prior federal, state, and local financial commit-
ments; (2) could be sustainably operated and maintained by

---

[2]Dep't of Transp. Actions to Address Environmental Justice in Minority
Populations and Low-Income Populations, 62 FR 18378-79 (April 15,
1997).

its operator(s) once built; (3) served high density areas; (4) was cost-effective; (5) increased the connectivity of the existing transit system; (6) could be easily accessed by transit users; and (7) was ready to be implemented.

MTC received proposals for fourteen rail projects and four bus projects. The rail projects included five BART projects, three Caltrain projects, and six others, with a total capital cost of $10.071 billion. The four bus projects had an overall capital cost of $1.468 billion, including three AC Transit proposals with a total capital cost of $1.28 billion. The three proposals for which AC Transit requested funds were: (1) Oakland-San Leandro Bus Rapid Transit, Phase 1 ($104 million); (2) Oakland-San Leandro Bus Rapid Transit, Phase 2 ($270 million); and (3) Enhanced Bus/Rapid Transit, Miscellaneous Corridors project, which included eight service corridors ($906 million).

## C.  Projects Included in the RTEP

On December 19, 2001, MTC adopted the Regional Transit Expansion Plan as Resolution 3434. The RTEP included nineteen projects with a total projected capital cost of $10.519 billion. The projects included all five proposed BART projects with a total capital cost of $5.266 billion, three Caltrain projects with a total capital cost of $1.059 billion, and two AC Transit projects with a total capital cost of $241 million. AC Transit's request for $270 million for its Oakland-San Leandro Bus Rapid Transit, Phase 2 project was excluded altogether. AC Transit's request for $906 million for its Miscellaneous Corridors service was reduced to $90 million, and scaled back to only three of the proposed eight service corridors. However, the largest BART expansion project — the more than $3 billion Warm Springs to San Jose extension — was in fact sponsored by VTA; the Transbay Terminal project, containing bus and rail elements, was sponsored by a joint powers board of which AC Transit was a member along with MUNI, GGT, and SamTrans; and the Caltrain projects

were sponsored by a joint powers board that included Sam-Trans, VTA, and MUNI.

In 2006, the RTEP was amended and updated to include twenty projects with a total project cost of $13.503 billion. Funding for all five BART expansions was increased. One of three Caltrain projects was completed, and funding was reduced for the other two. AC Transit's Miscellaneous Corridors service was scaled back from three corridors to one, and the funding cut from $90 million to $68 million. Funding for AC Transit's Oakland-San Leandro Bus Rapid Transit, Phase 1 project was increased from $151 million to $175 million.

### PROCEDURAL BACKGROUND

Plaintiffs filed their class action complaint on April 19, 2005, alleging intentional discrimination claims under the Equal Protection Clause and 42 U.S.C. § 2000d et seq. (Title VI of the Civil Rights Act of 1964), and state law claims for intentional and disparate impact discrimination under California Government Code § 11135. The parties stipulated to class certification.

The essence of Plaintiffs' complaint is that MTC's facially-neutral funding decisions disproportionately favor investment in rail service over bus service so as to adversely impact Bay Area minorities who make up a larger percentage of regional bus ridership than rail ridership. Plaintiffs argued that MTC's funding practices have both the effect and intent of discriminating against minorities.

Both Plaintiffs and MTC filed motions for summary judgment. Plaintiffs filed a motion for summary adjudication as to their prima facie case of their disparate impact discrimination under California Government Code section 11135. MTC filed a motion for summary judgment as to all of Plaintiffs' claims, and challenged the standing of both the individual and organization Plaintiffs. The district court granted summary judgment

in favor of MTC as to Plaintiffs' intentional discrimination claims, and denied all other motions.

Plaintiffs' state law disparate impact discrimination claims proceeded to a bench trial. The district court found that Plaintiffs had stated a prima case of disparate impact discrimination, but also found that MTC had met its rebuttal burden of showing by a preponderance of the evidence that there was a "substantial legitimate justification" for its challenged conduct, thus shifting the burden back to Plaintiffs to articulate an equally effective, less discriminatory alternative. The district court found that Plaintiffs had failed to do so. This appeal followed.

## STANDARD OF REVIEW

The district court's grant of summary judgment is reviewed de novo. *See Narayan v. EGL, Inc.*, 616 F.3d 895, 899 (9th Cir. 2010). We "must view the evidence 'in the light most favorable' to [Plaintiffs] to determine if there was no genuine issue as to any material fact and whether the defendants were entitled to judgment as a matter of law." *Crowe v. County of San Diego*, 608 F.3d 406, 427 (9th Cir. 2010) (quoting *Miller v. Auker*, 576 F.3d 979, 991 (9th Cir. 2009)). We review the district court's findings of fact for clear error, while "questions of law and mixed questions of fact and law are reviewed de novo, unless the mixed question is primary factual." *See N.B. v. Hellgate Elem. Sch. Dist., ex rel. Bd. of Dirs., Missoula County, Mont.*, 541 F.3d 1202, 1207 (9th Cir. 2008).

## DISCUSSION

## I.  Disparate Impact

California Government Code section 11135 prohibits discrimination "under[ ] any program or activity that . . . receives any financial assistance from the state." Title VI is identical in prohibiting discrimination, but applies to programs spon-

sored with federal funds. 42 U.S.C. § 2000d. In light of the parallel language of state and federal law, federal law provides important guidance in analyzing state disparate impact claims. *See City & County of San Francisco v. Fair Employment & Housing Comm'n,* 236 Cal. Rptr. 716, 721-22 (Cal. Ct. App. 1987). Thus, the state burden-shifting framework for analyzing disparate impact cases parallels the federal one: (1) a plaintiff establishes a prima facie case if the defendant's facially neutral practice causes a disproportionate adverse impact on a protected class; (2) to rebut, the defendant must justify the challenged practice; and (3) if the defendant meets its rebuttal burden, the plaintiff may still prevail by establishing a less discriminatory alternative. *Id.* at 721. We look to Title VII disparate impact analysis in analyzing Title VI claims. *Larry P. by Lucille P. v. Riles*, 793 F.2d 969, 982 & n.9 (9th Cir. 1984).

### A. The Percentage of Minorities Among the San Francisco Bay Area's Bus and Rail Ridership Is Not a Proper Measure for Assessing the Impact of the Challenged Conduct on Minorities.

"[T]o make out a prima facie case of disparate impact . . . plaintiffs [must] employ an 'appropriate measure' for assessing disparate impact." *N.Y. City Envtl. Justice Alliance v. Giuliani*, 214 F.3d 65, 69 (2d Cir. 2000) (citing *N.Y. Urban League v. State of N.Y.*, 71 F.3d 1031, 1038 (2d Cir. 1995)). A district court may not find the existence of disparate impact "on the sole basis of [a statistic] unless it reasonably [finds] that [the statistic] would be a reliable indicator of a disparate impact." *N.Y. Urban League*, 71 F.3d at 1038 (2d Cir. 1995). "[C]ourts [and] defendants [are not] obliged to assume that plaintiffs' statistical evidence is reliable." *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 996 (1988).

As to Plaintiffs' disparate impact claim, the district court, after trial, held that MTC's selection process for RTEP projects "causes a disparity in funding for rail projects that on the

whole are used by a lower percentage of minority riders, as opposed to bus projects." The district court's determination was based on the fact that 66.3 percent of bus riders are members of racial minority groups as opposed to only 51.6 percent of rail riders. The district court never expressly found that MTC's funding of rail over bus adversely affected San Francisco Bay Area minorities; however, a finding that Plaintiffs established a prima facie case of disparate impact demonstrates that the district court must have drawn that inference. Our court reviews a district court's inferences for clear error. *Inwood Labs, Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 856 n.16 (1982).

**[1]** "The basis for a successful disparate impact claim involves a comparison between two groups — those affected and those unaffected by the facially neutral policy." *Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 575 (2d Cir. 2003). An appropriate statistical measure must therefore take into account the correct population base and its racial makeup. *See Robinson v. Adams*, 847 F.2d 1315, 1318 (9th Cir. 1987). In *Smith v. Xerox Corp.*, plaintiffs sued Xerox under Title VII after a number of workers were laid off, asserting that the company's layoff criteria caused a disparate impact on older and male employees. 196 F.3d 358, 367 (2d Cir. 1999), *overruled on other grounds by Meacham v. Knolls Atomic Power Lab.*, 461 F.3d 134 (2d Cir. 2006). Instead of analyzing the effects of the layoffs on these groups as a whole, however, the "plaintiffs' expert either isolated units or pooled various units and ran separate analyses for each of these work-groups." *Id.* at 368-69. The Second Circuit held that such an analysis was insufficient to establish a prima facie case of disparate impact because

> In any large population a subset can be chosen that will make it appear as though the complained of practice produced a disparate impact. Yet, when the entire group is analyzed any observed differential may disappear, indicating that the identified employ-

ment practice was not the cause of the disparity observed in the subset.

*Id.* at 369.

[2] Here, Plaintiffs would have us analyze the impact of MTC's Regional Transit Expansion Plan on the minority population of AC Transit users or on minority bus riders. But MTC's RTEP does not affect solely bus riders or solely AC Transit riders — it affects an entire integrated transit system's users. Thus, we must analyze the impact of the plan on minorities in the population base "affected . . . by the facially neutral policy." *Tsombanidis*, 352 F.3d at 575; *see also Robinson*, 847 F.2d at 1318 (no prima facie case of disparate impact where wrong base population used in statistical sample); *Hallmark Developers, Inc. v. Fulton County, Ga.*, 466 F.3d 1276, 1286 (11th Cir. 2006) ("[T]he appropriate inquiry is into the impact on the total group to which a policy or decision applies") (citing *Betsey v. Turtle Creek Assocs.*, 736 F.2d 983, 987 (4th Cir. 1984)).

[3] From the facts before us, it is impossible to say with any confidence that San Francisco Bay Area minorities are adversely affected by the RTEP. The district court erred by relying on a faulty syllogism: (1) a greater percentage of bus riders than rail riders are minorities; (2) fewer bus expansion projects than rail expansion projects were included in the RTEP, and bus projects received a lesser percentage of requested funding than did rail projects; (3) therefore, minorities were adversely affected. The fault lies in the reliance on the overall regional ridership statistics for existing bus and rail service. What is key is that these statistics say nothing about the particular ridership of the planned expansions. Simply because minorities represent a greater majority of bus riders as opposed to rail riders, the rejection of a particular new bus expansion project in favor of a new rail expansion project will not necessarily work to the detriment of minorities. It is a real possibility that a particular bus project supported by AC

Transit — Transbay service, for example — will serve a largely white ridership. On the other hand, a rail expansion project — the BART project connecting the East Bay to San Jose, or the MUNI central subway project connecting Bayview and Chinatown, for example — may benefit minority riders more than white riders by serving areas with high concentrations of minorities, and integrating them more fully into the regional rail system. In fact, although AC Transit's ridership may have a higher percentage of minorities, BART annually carries over two million more minority riders than AC Transit. It is entirely plausible that an RTEP with a heavy emphasis on rail could significantly benefit Bay Area minorities. However, a court simply could not determine from Plaintiffs' statistical evidence whether the projects in the RTEP will benefit or harm the Bay Area's minority transit riders.[3]

In *Robinson*, the plaintiff filed a disparate impact claim against Orange County for its alleged discriminatory hiring practices, contending that "he established a prima facie case of discriminatory impact by citing statistics which allegedly show that the percentage of Blacks in Orange County and in surrounding counties is higher than the percentage of Blacks employed by Orange County." 847 F.2d at 1318. We rejected the plaintiff's claim, however, holding that he "fail[ed] to establish that these general population statistics represent a pool of prospective applicants qualified for the jobs for which he applied. We have consistently rejected the usefulness of

---

[3]Further evidence that Plaintiffs have failed to provide an appropriate statistical measure of discrimination is that a vast majority of the rail projects that Plaintiffs challenge as discriminatory are sponsored by transit operators with a high percentage of minority ridership. MTC's expansion projects that are sponsored, at least in part, by transit operators with at least seventy percent minorities account for approximately $9 billion of the $13.5 billion of projected RTEP costs. There is no evidence to suggest that these operators are sponsoring projects to the detriment of their constituents. If Plaintiffs believe that these sponsoring decisions are made to the detriment of these operators' minority constituencies, then their dispute is with the operators, not with MTC.

general population statistics as a proxy for the pool of potential applicants where the employer sought applicants for positions requiring special skills." *Id.*[4]

Plaintiffs' regional-level population statistics fail to explain with any precision the effect the Regional Transit Expansion Plan will have on minority transit users. Under Plaintiffs' theory, so long as the population of bus riders contains a greater percentage of minorities than the population of rail riders, any RTEP that emphasizes rail expansion over bus expansion, even where such a plan may confer a far greater benefit upon minorities than whites, would be subject to legal challenge. Indeed, MTC could be effectively prevented from any efforts to expand rail service to accommodate more minority riders out of fear that they could be sued for discriminating against precisely the groups that they seek to integrate into the regional transit system.

There are few available cases factually similar to this one; however, *Bean v. Southwestern Waste Management Corp.*, 482 F. Supp. 673 (S.D. Tex. 1979), is one example and illustrates the importance of providing an appropriately precise statistical measure of disparate impact. In *Bean*, the plaintiffs challenged Texas's decision to place a waste management facility in their neighborhood, arguing that its placement was motivated by racial discrimination. *Id.* at 674-75. The district court denied the plaintiffs' motion for a preliminary injunction for failing to establish any statistical evidence of discrimination. The *Bean* plaintiffs divided the city into four quadrants and argued that the data showed that Texas dispro-

---

[4]Although Plaintiffs have cited *Committee Concerning Community Improvement v. City of Modesto* (*CCCI*), 583 F.3d 690, 702 (9th Cir. 2009), for the proposition that the use of generic bus- and rail-rider statistics was appropriate, *CCCI* does not support their argument. In *CCCI*, neighborhood-level data was correctly used for neighborhood-level policies. *Id.* at 703-04. *CCCI* did not address the issue raised here of using pre-defined generic statistics to measure the impact of a policy affecting a different population.

portionately placed waste treatment facilities in the minority-quadrants. *Id.* at 678. However, when the district court viewed where the waste management facilities were placed from the perspective of more precise census tract data, it found that their placements actually favored minorities, and that plaintiffs' aggregate data was only "compelling on its surface." *Id.* at 678-79.

*Bean* is directly applicable to Plaintiffs' prima facie case here. If the court had more precise data that would allow it to evaluate each project's impact on transit ridership, it could very well find that the proposed expansion plan actually favors minorities, or harms minorities to a greater extent than regional-level statistics may suggest. As it stands, however, Plaintiffs' data is insufficient to foreclose either possibility, or permit a court to reach either conclusion.

**[4]** The district court's inference that minorities were adversely affected by the RTEP is based on an inappropriate statistical measure and a logical fallacy, and is therefore clearly erroneous. *See United States v. Hinkson*, 585 F.3d 1247, 1263 (9th Cir. 2009) (en banc) ("[W]e will affirm a district court's factual finding unless that finding is illogical, implausible, or without support in inferences that may be drawn from the record." (internal footnote omitted)). Plaintiffs have failed to provide statistical evidence that demonstrates the projects included in the 2006 amendment to the RTEP will have an adverse impact on minorities. By failing to provide an appropriately tailored statistical measure, Plaintiffs have not carried their burden to establish a prima facie case of disparate impact discrimination. *See N.Y. City Envtl. Justice Alliance v. Giuliani*, 214 F.3d 65, 71 (2d Cir. 2000) ("[T]he plaintiffs chose a [statistical] measure that was inadequate to allow us to ascribe significance to any alleged disparate impact of the City's actions").

"Because we may affirm on any ground supported by the record," *United States v. Tello*, 600 F.3d 1161 (9th Cir. 2010),

and because we think it unwise to rule on a state law issue of first impression when the resolution of a case does not require it, we do not address the district court's decision as to any other aspects of Plaintiffs' claims under California Government Code section 11135.

## II.   Intentional Discrimination

Plaintiffs challenge the district court's summary judgment in favor of MTC on grounds that they failed to raise a triable issue of fact as to discriminatory intent. "Plaintiffs' § 1983 claims alleging violations of equal protection and Title VI require similar proofs — plaintiffs must show that actions of the defendants had a discriminatory impact, and that defendants acted with an intent or purpose to discriminate based upon plaintiffs' membership in a protected class." *CCCI*, 583 F.3d at 702-03. Plaintiffs concede that they have no direct evidence of discrimination, but argue that circumstantial evidence creates a triable issue of fact as to intentional discrimination. *See Arlington Heights v. Metro. Housing Dev. Corp*, 429 U.S. 252, 266 (1977)). Even without direct evidence, a plaintiff may articulate discriminatory intent through evidence of (1) discriminatory impact; (2) " '[t]he historical background of the decision . . . particularly if it reveals a series of official actions taken for invidious purposes' "; (3) "irregularities in the passage of legislation such as 'departures from normal procedural sequence,' "; and (4) " 'legislative or administrative history' such as 'contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports.' " *Navarro v. Block*, 72 F.3d 712, 716 (9th Cir. 1995) (quoting *Arlington Heights*, 429 U.S. at 266-67 (alterations in original)). To defeat summary judgment, Plaintiffs must present evidence based upon which any reasonable fact-finder could conclude that MTC acted "at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group," *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979).

**[5]** As discussed above, Plaintiffs' failure to establish that MTC's challenged conduct has a discriminatory impact prevents any inference of intentional discrimination. Plaintiffs' intentional discrimination claim relies on drawing equivalences, between (1) bus-riders and minorities, and (2) rail-riders and whites, that are not borne out by the data. Plaintiffs' lack of any direct evidence of racial animus leaves us only with circumstantial evidence of a policymaking process that does not support an inference that MTC's conduct is motivated by any racial bias.

**[6]** Plaintiffs argue that the district court engaged in impermissible "weighing of the evidence" at summary judgment; however, Plaintiffs' evidence simply does not bear the weight of the inferences placed upon it. Viewed in the light most favorable to Plaintiffs, the evidence would not allow any reasonable factfinder to conclude that MTC's decisions with respect to the 2006 RTEP were motivated "at least in part 'because of,' not merely 'in spite of,' its adverse effects upon [Plaintiffs]." *Feeney*, 442 U.S. at 279.

## CONCLUSION

For the foregoing reasons, the judgment of the district court is AFFIRMED.

NOONAN, Circuit Judge, concurring:

The American instinct to cast controversies into a legal forum has been an American characteristic at least since Alexis de Tocqueville observed in 1835, "Scarcely any political question arises in the United States that is not resolved, sooner or later, into a judicial question." Tocqueville, *Democracy in America*, trans. Henry Reeves, revised by Francis Bowen, and ed. by Phillips Bradley, vol. 1, p. 280. No doubt the instinct is both laudable and optimistic — laudable

because litigation is more peaceful than pugilistic and optimistic because it assumes that a court is capable of resolving almost any question.

The present case illustrates the instinct carried very far. A federal court is asked to review the allocation of billions of dollars among a variety of state agencies, some of them not before the court. The court is asked to look into the future to gauge the fairness of the allocations. The court is asked to assume the identity and interests of various parts of the population characterized by the litigants in terms of categories created by the racial origins of the persons living here today. Using these categories — hopelessly outdated in the Bay Area — this litigation presents a controversy in which the court is asked to determine the fairness of future plans dependent on at least seven factors which the court would have to measure, combine, and evaluate as a balanced or unbalanced combination.

The twentieth century racial categories so confidently deployed no longer correspond to American life among the young. See Susan Saulny, "Black? White? Asian? More Americans Chose All of the Above," *The New York Times*, January 30, 2011, page 1 and page 20. What is true of the young is already characteristic of the Bay Area where social change has been fostered by liberal political attitudes, and a culture of tolerance. An individual bigot may be found, perhaps even a pocket of racists. The notion of a Bay Area board bent on racist goals is a specter that only desperate litigation could entertain.

The parties, the magistrate judge who heard them, and my colleagues have plunged heroically into the messy mass of facts, factors and guesses going into planning for regional transportation. The opinion of the court accurately concludes that the plaintiffs failed to show any intent to discriminate and failed to show any disparate impact from the funding planned.