[PUBLISH]


IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
October 12, 2006
THOMAS K. KAHN
CLERK

_____

No. 05-15633

_____

D. C. Docket No. 02–01862-CV-ODE-1

HALLMARK DEVELOPERS, INC.,
CHARLES GARRISON,

Plaintiffs-Appellants,

versus

FULTON COUNTY, GEORGIA,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

**(October 12, 2006)**

Before EDMONDSON, BIRCH and ALARCÓN,[*] Circuit Judges.

ALARCÓN, Circuit Judge:

_____

[*]Honorable Arthur L. Alarcón, United States Circuit Judge for the Ninth Circuit, sitting by designation.

# I

Appellants Hallmark Developers, Inc. and Charles Garrison (collectively, "Hallmark") appeal from (1) the summary judgment in favor of Appellee Fulton County, Georgia ("the County") on their intentional discrimination claim based on the Fair Housing Act, 42 U.S.C. § 3601, *et seq.* ("FHA"); and (2) the judgment entered following a bench trial on the merits on their discriminatory impact claim based on the FHA.

The District Court concluded that Hallmark had failed to adduce evidence that the County had intentionally discriminated on the basis of race when it refused to re-zone a parcel of property in order for Hallmark to build, *inter alia*, homes affordable to households with low and moderate incomes. The District Court also concluded that Hallmark failed to demonstrate that the re-zoning decision had a significant disparate impact on minorities. Hallmark argues that (1) the District Court failed to consider relevant evidence of discriminatory intent; (2) was clearly in error in its finding regarding disparate impact; and (3) considered expert testimony that should have been excluded under Rule 702 of the Federal Rules of Evidence.

## II

For many years, Chris Doughtie, president of Hallmark, received literature and invitations to attend business functions in South Fulton County, Georgia. This literature identified South Fulton County as a "development target and advised developers of the incentives to encourage development in the corridor."

Accordingly, Hallmark and Appellant Charles Garrison acquired property in South Fulton County ("the Property") with the express intention of developing it for a mixture of uses, including commercial, office, and residential. Specifically, they hoped to construct a large development consisting of apartments, townhomes single-family homes, and office space. The townhomes and single-family homes would be built under the control of Hallmark. The apartments would be built by a contractor subject to conditions imposed by Hallmark. Hallmark intended that a large percentage of the homes would be "affordable," as defined by the Department of Housing and Urban Development ("HUD").[1] The Property would have to be re-zoned from AG-1 (agricultural) to MIX (mixed use) in order for this development to take place.

In early 2001, Mr. Doughtie arranged for a visit to Chestnut Lake, a low-

---

[1]Under HUD definitions, housing is "affordable" if a person making 80% of the annual median income for a given geographical area pays 30% or less of gross monthly income for mortgage and utilities or rent and utilities. *See* 24 C.F.R. §§ 92.2, 92.252, 92.254.

income, single-family subdivision that Hallmark had developed in DeKalb County, Georgia. Among others, he invited Fulton County Commissioner William Edwards, Fulton County Assistant Director of Comprehensive Planning Beth McMillan, and Fulton County Economic Development Director Joseph Johnson. The purpose of the visit was to acquaint these county officials with the sort of development Hallmark intended to make on the Property.

Chestnut Lake contains 700 lots. The homes initially were priced in the range of $89,000 to $130,000, but after changes were made, the price range was from approximately $120,000 to $150,000. The homes were built by Mayfield Homes, which is owned in part by Mr. Doughtie and his son. Mr. Doughtie told the county officials that Mayfield Homes would build the single-family homes on the Property as well, and that the homes on the Property would be similar in appearance and layout to those at Chestnut Lake.

During this visit, none of the county officials expressed any concern regarding the quality of the Chestnut Lake development.[2] Commissioner Edwards, however, cautioned Mr. Doughtie to involve South Fulton community associations

---

[2]In its order on summary judgment, the District Court stated that it was undisputed that no concerns regarding quality were expressed. At trial, Commissioner Edwards testified that he had concerns over the quality of the homes. He felt, among other things, that they were "very generic," had very small rooms, and "just looked like row houses." It is not clear whether he expressed these concerns to Mr. Doughtie.

in the re-zoning process to "get the community happy." Among the community groups Commissioner Edwards listed were the South Fulton Parkway Alliance, the Cliffondale Community Association, and Green South Fulton ("the community groups").

On October 30, 2001, Hallmark filed an application with the Fulton County Department of Environment and Community Development seeking to re-zone the Property. Kathryn Zickert appeared before the Board of Commissioners ("the Board") on behalf of Hallmark at a public hearing on February 6, 2002. The Board granted a 60-day deferral to allow Hallmark to engage in discussions with the community groups regarding the proposed development.

On April 3, 2002, Ms. Zickert appeared before the Board on behalf of Hallmark a second time. After the public hearing, Commissioner Edwards (who is commissioner of the district where the Property is located) moved to deny Hallmark's re-zoning application "based on the quality of what [he'd] seen and things [he'd] heard." Chairman Mike Kenn supported Commissioner Edwards's motion. He stated that the development was "probably one of the poorest-designed, laid out subdivisions [he'd] ever seen." Another commissioner made a substitute motion for an additional 60-day deferral, and the Board granted the deferral so that Hallmark could continue to discuss unresolved issues with the

5

community groups.

On June 5, 2002, Ms. Zickert appeared before the Board on behalf of Hallmark a third and final time. Commissioner Edwards moved to deny the application due to the lack of improvement "in terms of the quality of the site plan and the site plan design." Hallmark's re-zoning application was denied.

While Hallmark's application for re-zoning was pending, Mr. Doughtie, his colleagues, and his attorneys met with the community groups as suggested by Commissioner Edwards. During the meetings, community group members expressed opposition to the proposed development on the Property. Three community leaders, Abby Jordan, Dave Robinson, and Larry Hyde stated that they opposed the proposed development because it was likely to attract "blacks" and families with children to the area. Another community activist, Bruce Moody, stated that he did not want poor black people moving into low-rent, lower priced homes in South Fulton County.

On January 26, 2001, at a meeting with a community group, Hallmark's counsel heard Commissioner Edwards say to Ms. Jordan, "I know a lot of your objections to projects like [Hallmark's] proposed development, is a black issue." The community groups also objected to the quality of the proposed homes, "made demands which drove up the prices of homes," and "did not want apartments in

anything but luxury form." Hallmark agreed to many of the changes in the quality of the development that the community groups suggested.

Hallmark did not produce evidence that any racist remarks were made at the hearings in front of the Board. Although Hallmark contends that "subtle remarks were made by no fewer than three activists" to the Board at the second hearing on April 3, 2002, Hallmark does not state exactly what the remarks were.[3] The County points out that one member of the community stated:

> What I'm saying is that we have no choices that are over
> [$150,000, with reference to the price of the homes].
> And what I'm trying to get at is if we just keep building
> houses that are all under 150, we will never raise the bar
> in South Fulton. We will never bring in the kind of
> development that I thought this Commission envisioned.

The same community member later referred to the "apartment challenge" and "the transient part of that." Commissioner Emma Darnell responded:

> That's a bad argument to bring to me. Let the approach
> have something to do with some objective measurement
> of the quality of life. Talk to me about environment.
> Talk to me about traffic. Let's not bring our personal
> aesthetic prejudices and biases to the table . . . this
> County Commission is not going to close its doors to
> ordinary working people who also want to live and have
> nice houses.

---

[3]The gist of the statements appears to be that the community members wanted the development to be more upscale.

Commissioner Nancy Boxill stated: "I don't want to participate in a zoning process that starts to say what kind of person gets to live where." Commissioner Edwards stated:

> Let me just add, too, because I want to thank both my colleagues for bringing out a very good point and a sensitive point because you understand my motion [to deny the re-zoning application] has nothing to do with price. . . But we do talk about price and a lot of times I think we should change that to quality and other things. And that was the basis of my denial.

Another community member said something about keeping South Fulton Parkway "pristine." Commissioner Boxill stated that the community members were describing a "redlining" practice.

The County's Planning Staff, Community Zoning Board, the Atlanta Regional Commission, and the Georgia Regional Transportation Authority reviewed and repeatedly recommended approval for Hallmark's zoning application. Nevertheless, Commissioner Edwards voted to deny the re-zoning. He was apparently influenced by the opposition of the community groups in this decision. He stated in his deposition that ninety percent of the zonings that happen in South Fulton County are "done real simple between the community and the developer." Zoning applications opposed by such community groups are usually not approved. Actual voting records confirm that in eighty-nine of ninety-

8

five instances, Commissioner Edwards's vote reflected the community's position. Typically, other commissioners show "district courtesy" to each other. If a proposed project is located within one commissioner's district, the other commissioners defer to that commissioner's wishes.

Following the denial of its application, Hallmark filed a complaint under the FHA, contending that the County discriminated on the basis of race in denying its application. Hallmark alleged that in giving effect to the racist views of the community groups, the County acted with intent to discriminate. It also alleged that the denial of the re-zoning worked a disparate impact on African-Americans, who were more likely to be the purchasers of the homes and renters of the apartments and townhomes on the Property. The District Court granted summary judgment in favor of the County with regard to the intentional discrimination claim. It concluded that there was no evidence that the County was aware of the racist views of the community members. It denied the motion for summary judgment with regard to the disparate impact claim.

At trial, Hallmark produced an expert witness, Dr. Bradford, who testified that the re-zoning decision had a disparate impact on minorities. Specifically, he testified that "the elimination of either for sale or rental housing in the lower cost ranges of the proposal for the Hallmark development would disproportionately and

9

adversely affect minority households as compared to white households." He

calculated disparity ratios[4] based on an assumption that persons who owned homes

or rented apartments in certain "value ranges" in particular geographical areas

were representative of those who would have purchased or rented homes on the

Property. Using data from the 2000 United States Census, Dr. Bradford examined

the race of each homeowner or renter, the individual's estimate of the value of his

or her home or the amount of rent, and the address of the residence. He examined

this data in five geographical areas, of increasing size, that surround the Property:

(1) the area within a 10-mile radius of the Property; (2) the area within a 20-mile

radius of the Property; (3) the area within a 30-mile radius of the Property; (4) the

30-mile radius from central Atlanta; and (5) the 20 counties surrounding Atlanta.

He opined that the 30-mile radius from central Atlanta and the 20-county area

would be the most reliable indicator of the race of the likely owners or renters on

the Property.

Based on the disparity ratios he calculated, Dr. Bradford concluded that

there would be a statistically significant disparate racial impact arising from the

---

[4]A "disparity ratio" is arrived at by dividing the percentage of all minority households living in a certain value or rent range by the percentage of all white households living in that same value or rent range. The underlying percentages are arrived at by dividing, for each racial group, the total number of households within one value or rent range by the total number of households within all values or rent ranges.

denial of the re-zoning due to the elimination of homes priced below $125,000 and rental housing costing less than $750 per month.

The County produced an expert who testified that there is an oversupply of housing within the price ranges Dr. Bradford testified were relevant to the disparate impact on minorities. Dr. Camilla Johnson Moore, Director of the Fulton County Office of Housing testified that at the time Hallmark's re-zoning application was denied, there was adequate housing for low and moderate income residents. She testified there was an "oversaturation." The District Court credited this testimony. It concluded because other housing was available within the price ranges that would allegedly produce the disparate impact, there was no appreciable impact on minorities caused by the lack of the particular development Hallmark wished to construct.

The District Court also concluded that the impact to which Dr. Bradford testified was not significant. In terms of pure percentages (as opposed to disparity ratios), black home purchasers and renters occupied only a slightly larger percentage of the market than Caucasians in the relevant price ranges.

Finally, the District Court concluded that Dr. Bradford's testimony was inherently speculative. His calculations related to an estimated, hypothetical

group of individuals.[5]  Additionally, the District Court found that there was no guarantee that any of the homes or apartments, if built, would be priced as Hallmark intended.  In the Chestnut Lake development, the homes sold for a higher price than originally intended.  The apartments were not to be built by Hallmark, but by a contractor.  Because Dr. Bradford's opinion regarding disparate impact was based on a specific price range, any potential changes in the prices at which the homes actually sold or the apartments actually rented would affect the validity of Dr. Bradford's opinion.

Having concluded that Dr. Bradford's testimony failed to establish a prima facie case of disparate impact, the District Court entered judgment in favor of the County.  Hallmark has timely appealed.

### III

### A

Hallmark argues that the District Court erred in entering summary judgment on its claim of intentional discrimination.  The District Court's entry of summary judgment is reviewed *de novo*.  Summary judgment is appropriate only if there is no genuine issue of material fact and the moving party is entitled to judgment as a

---

[5]He hypothesized and estimated this group on the assumption that those who currently live in a given home value or rent range would be likely to purchase a home or rent an apartment in the same price range on the Property.

matter of law. *Lippert v. Cmty. Bank, Inc.*, 438 F.3d 1275, 1278 (11th Cir. 2006).

The FHA prohibits the "refus[al] to sell or rent . . . or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, or national origin." 42 U.S.C. § 3604(a). In order to prevail on a claim under the FHA, a plaintiff must demonstrate "unequal treatment on the basis of race that affects the availability of housing." *Jackson v. Okaloosa County Fla.*, 21 F.3d 1531, 1542 (11th Cir. 1994). Housing may become unavailable within the meaning of the FHA as a result of zoning decisions that effectively prohibit the construction of housing. *Id.* at 1542 n.17.

To prove that a zoning decision was based on intentional discrimination, a plaintiff must "establish that race played some role" in the decision. *Sofarelli v. Pinellas County*, 931 F.2d 718, 722 (11th Cir. 1991).

> Because explicit statements of racially discriminatory motivation are decreasing, circumstantial evidence must often be used to establish the requisite intent. Among the factors that are instructive in determining whether racially discriminatory intent is present are: discriminatory or segregative effect, historical background, the sequence of events leading up to the challenged actions, and whether there were any departures from normal or substantive criteria.

*United States v. Hous. Authority of the City of Chickasaw*, 504 F. Supp. 716, 727 (S.D. Ala. 1980) (citing *Vill. of Arlington Heights v. Metropolitan Hous. Dev.*

13

*Corp.*, 429 U.S. 252 (1977)); *see also United States v. City of Birmingham, Mich.*, 727 F.2d 560, 566 (6th Cir. 1984) (articulating same test). For the sake of discussion, we also accept that a plaintiff may demonstrate intentional discrimination if the "decision-making body acted for the sole purpose of effectuating the desires of private citizens, that racial considerations were a motivating factor behind those desires, and that members of the decision-making body were aware of the motivations of the private citizens." *United States v. Yonkers*, 837 F.2d 1181, 1225 (2d Cir. 1987); *see also United States v. City of Black Jack, Missouri*, 508 F.2d 1179, 1185 n.3 (8th Cir. 1975); *Jackson* v. City of Auburn, 41 F. Supp. 2d 1300, 1311 (M.D. Ala 1999) ("If . . . a zoning board's response to political pressure amounts to implementation of local residents' discriminatory impulses, then the board's actions may give rise to a cause of action for intentional discrimination."). Hallmark contends that the County implemented the racist attitudes of community groups in its re-zoning decision. It also argues that by applying the multi-factor test enunciated in *City of Chickasaw*, we can infer that the County intentionally discriminated against African-Americans in its re-zoning decision.

Hallmark produced evidence that the County acted for the sole purpose of effectuating the desires of the community groups and that Commissioner Edwards

14

felt pressured by the groups. He encouraged Hallmark to meet with the groups, and he met with the groups. Commissioner Edwards testified that he typically votes in a manner consistent with the desires of the community groups. Hallmark also demonstrated that some members of the community groups were motivated by racial considerations. Hallmark's evidence showed that during its own meetings with the community groups, racist remarks were made.

However, Hallmark failed to establish that "members of the decision-making body were aware of the motivations of the private citizens." *Yonkers*, 837 F.3d at 1225. Although Hallmark contends that Commissioner Edwards told a community leader, "I know a lot of your objection to projects [like Hallmark's] proposed development, is a black issue," this is not sufficient to raise a triable issue of fact. This statement does not demonstrate that (1) the other members of the Board were aware of the racist attitudes of the community leaders; (2) that Commissioner Edwards was aware that any other community leaders had racist motivations; or (3) that despite the racist motivations of certain community leaders, the Board was not justified in denying the re-zoning based on the quality of the proposed development. *See Jim Sowell Constr. Co., Inc. v. City of Coppell, Tex.*, 61 F. Supp. 2d 542, 552 (N.D. Tex. 1999) ("The . . . evidence indicates that many other citizens voiced their opposition to multifamily housing based on race-

neutral reasons, such as the adverse impact that dense housing facilities have on public, services, traffic, and child safety. The evidence, viewed in the aggregate, would permit a reasonable trier of fact to find only that the allegedly-biased statements composed but a small fraction of the opinions presented to the decisionmaking bodies.").

Next, Hallmark points to statements made at the hearings that it characterizes as "subtle" statements of bias. The statements to which it refers are objections to the proposed price of the housing. They do not demonstrate racial animus. They demonstrate class animus. Wealth is not a proxy for race. *See James v. Valtierra*, 402 U.S. 137, 140-42 (1971); *Boyd v. Lefrak Org.*, 509 F.2d 1110, 1112-13 (2d Cir. 1975). These statements are not sufficient to overcome summary judgment. *Macone v. Town of Wakefield*, 277 F.3d 1, 7 (1st Cir. 2002) ("While ambiguous remarks may, under some circumstances, help to illuminate the summary judgment record, such remarks rarely will suffice to conceive an issue of material fact when none otherwise exists." ) (quoting *Nat'l Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 743-44 (1st Cir. 1995)); *cf. Metropolitan Hous. Dev. Corp.*, 558 F.2d 1283, 1292 (7th Cir. 1977) ("The bigoted comments of a few citizens, even those with power, should not invalidate action which in fact has a legitimate basis.").

Finally, in a footnote in its reply brief, Hallmark states that the County's Director of the Office of Housing, Dr. Moore, testified at trial that because the area in which the Property is located is already predominately populated by minorities, the re-zoning could have perpetuated segregation and result in "ghettotization." Hallmark characterizes this testimony as racist. Racist or not, Dr. Moore was not a decision-maker with regard to Hallmark's re-zoning application. Her testimony does not establish that any Board member intentionally discriminated against African-Americans in voting against zoning.

Applying the multi-factor test articulated in *City of Chickasaw*, Hallmark contends that it has produced sufficient circumstantial evidence of discriminatory intent. The first factor is whether there is evidence of discriminatory impact. *City of Chickasaw*, 504 F. Supp. at 727. The testimony of Dr. Bradford, although not sufficient on this point to render the District Court's judgment clearly erroneous (as will be discussed below), does establish discriminatory impact. *See Jim Sowell*, 61 F. Supp. 2d at 547 n.1 (standard is lower for discriminatory impact when part of the discriminatory intent inquiry).

Next, with regard to the "historical background" of the zoning decision, Hallmark argues that the Board ratified the community groups' discriminatory motives. However, there is no evidence that the Board in fact ratified the

discriminatory motives of any community group.

With regard to the third factor, the sequence of events leading up to the denial of the re-zoning, Hallmark points out that it was required to meet with community groups repeatedly and that those groups expressed racial animus. However, this sequence of events is only relevant if it demonstrates that the Board ratified the racial biases of those groups.

Next, Hallmark produced evidence that the Board departed from customary procedures in ignoring the recommendations of approval from its staff and planning bodies and in holding three hearings. Such "procedural abnormalities are only relevant within a larger scope." *Macone*, 277 F.3d at 6. Here, there is no context that renders this deviation suspect. The procedural departures are explainable as a response to community concern. There is nothing inherently wrong with responding to community pressure. Here, with no racial animus expressed to the Board, bowing to political pressure does not demonstrate racial animus.

Hallmark also maintains that the Board departed from substantive standards in denying its application. Hallmark produced evidence that the proposed development was consistent with the uses proscribed in the County's Land Use Plan. However, there is no evidence that the Board denied the proposed

18

development because it had concluded it was inconsistent with the County's Land Use Plan. Rather, the Board voted against re-zoning because Hallmark's proposed development was unpopular with voters and was poorly designed.

Hallmark has failed to demonstrate through direct or circumstantial evidence that the Board intentionally discriminated on the basis of race in denying the re-zoning application.

**B**

Hallmark also argues that the District Court erred in entering judgment in favor of the County on its discriminatory impact claim. We may not set aside the District Court's findings of fact unless they are clearly erroneous. *Holton v. City of Thomasville Sch. Dist.*, 425 F.3d 1325, 1350-51 (11th Cir. 2005). Clear error is a highly deferential standard of review. *Id.*

"[A] showing of significant discriminatory effect suffices to demonstrate a [prima facie] violation of the Fair Housing Act." *Jackson*, 21 F.3d at 1543. A plaintiff can demonstrate a discriminatory effect in two ways: it can demonstrate that the decision has a segregative effect or that "it makes housing options significantly more restrictive for members of a protected group than for persons outside that group." *Hous. Investors, Inc. v. City of Clanton, Ala.*, 68 F. Supp. 2d 1287, 1298 (M.D. Ala. 1999). In this case, Hallmark advances only the second

19

theory–that the re-zoning decision of the County had a harsher impact on minorities than Caucasians.

Typically, a disparate impact is demonstrated by statistics. *See, e.g., Huntington Branch, NAACP v. Town of Huntington*, 844 F.2d 926, 938 (2d Cir. 1988); *City of Black Jack*, 508 F.2d at 1186. Although no "single test controls in measuring disparate impact," *Langlois v. Abington Hous. Auth.*, 207 F.3d 43, 50 (1st Cir. 2000) (citing *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 995-96 n.3 (1988)), certain guidelines have developed. First, it may be inappropriate to rely on "absolute numbers rather than on proportional statistics." *Huntington*, 844 F.2d at 938. Second, "statistics based on the general population [should] bear a proven relationship to the actual applicant flow." *Id.* at 938 n.11. Third, the appropriate inquiry is into the impact on the total group to which a policy or decision applies. *Betsey v. Turtle Creek Assocs.*, 736 F.2d 983, 987 (4th Cir. 1984).

> Whether the measure of disparate impact used is disproportional representation, in which the percentage of minority representation in the affected group is compared against that minority's representation in the general population, or disproportionate adverse impact, in which the minority group's percentage representation in the affected group is compared against the majority group's representation in the affected group, the starting

> point is always the subset of the population that is affected by the disputed decision.

*City of Clanton*, 68 F. Supp. at 1299.

In this case, Dr. Bradford appropriately measured the proportional impact on each race and performed his analysis with regard to the group "affected by the disputed decision." The difficulty, however, is that the group "affected by the disputed decision" is inherently speculative. Whether a person who currently owns a home or rents an apartment within the price ranges proposed by Hallmark for its development would purchase or rent one of Hallmark's homes is speculative. This renders Dr. Bradford's estimation of the impact on minorities suspect. There is no evidence that the statistics based on this general population of home owners and renters bears "a proven relationship to the actual applicant flow." *See Huntington*, 844 F.2d at 938 n.11; *see also Macone*, 277 F.3d at 8 ("Here, there is no information that any minorities would actually move into the Hillview Estates Project.").

In this respect, this case is distinguishable from the majority of cases in which disparate impact was found. In those cases, invariably there was a waiting list for affordable housing or a shortage of housing for which only a defined group qualified. *See, e.g.*, *Langois*, 207 F.3d at 47-48 (considering those who qualify for federally subsidized housing); *Jackson*, 21 F.3d at 1543 (majority of individuals

on wait-list for housing were minority); *Huntington*, 844 F.2d at 929 (considering impact of housing shortage on those who qualify for federally subsidized housing); *Betsey*, 736 F.2d at 987 (particular individuals evicted from homes); *Metropolitan Hous. Dev.*, 558 F.2d at 1288 (considering housing intended for those who qualify for federal subsidies); *City of Black Jack*, 508 F.2d at 1186 (with regard to housing intended for those within a certain income range, there "was ample proof that many blacks would live in the development"); *Ass'n of Relatives and Friends of AIDS Patients v. Regulations and Permits Admin.*, 740 F. Supp. 95, 98 (D. P.R. 1990) (impact is on group of individuals with AIDS who were intended to live in group home); *Malone v. City of Fenton, Missouri*, 592 F. Supp. 1135, 1162 (E.D. Mo. 1984) (considering only those who qualify for federally subsidized housing). The inherent difficulty in defining the group affected by the re-zoning decision supports the District Court's decision that Dr. Bradford's results are "inherently speculative."

Another difficulty with Dr. Bradford's testimony identified by the District Court is the existence of other housing within the price range proposed by Hallmark. Hallmark contends that the District Court's conclusion on this issue was clearly erroneous for two reasons: (1) it was based on the testimony of Mr. Gary Hammond, who Hallmark contends was not qualified as an expert; and (2)

because the existence of other available housing is irrelevant.

First, the District Court's conclusion with regard to the availability of other housing was not based solely on the testimony of Mr. Hammond. Dr. Moore also testified that there was adequate housing for low and moderate income residents. The District Court did not clearly err in crediting this testimony.

Second, the availability of other housing within the relevant price ranges is relevant to the accuracy of Dr. Bradford's statistics. If there is a glut in the market of homes in Hallmark's projected price range, the lack of the Hallmark's particular development is not likely to have an impact on *anyone*, let alone adversely affect one group disproportionately. As explained above, adverse impact is consistently found when there is a housing shortage. *See, e.g., Metropolitan Hous. Dev.*, 558 F.2d at 1288 (noting that decision not to re-zone land for public housing precluded public housing in that area unless other land were zoned). It stands to reason that the impact of a failure to build particular housing may be measured more accurately when no other housing is available.

Hallmark argues that the District Court erred in considering whether housing was available at the time the Board denied its re-zoning application because the area in which the Property is located is expected to grow population-wise over the next ten to fifteen years. Hallmark contends that housing

opportunities for minorities will be denied in the future if affordable housing is not built. Hallmark cites no authority for the proposition that this Court should consider whether there will be an impact in the future on minorities, as opposed to whether there was an impact at the time of the zoning decision. Additionally, Hallmark's argument is speculative. It cannot be determined what type of housing will be built in the future or what the price of that housing will be.

Hallmark asserts that "blocking these units from being built . . . denies these minority households the opportunity and advantage of increased housing choices and supply." It contends that by looking at the existence of other housing when this particular housing was denied is like saying that even if one lunch counter is "whites only," there is no harm if other lunch counters are available. However,

> there is no federally protected right *to housing in a particular community*, an allegation which lies at the essence of plaintiff's action. . . . Plaintiffs are not prevented from obtaining all housing in the [South Fulton] community as a result of [the decision not to re-zone].

*Schmidt v. Boston Hous. Auth.*, 505 F. Supp. 988, 995-96 (D. Mass. 1981) (emphasis added). Nor does Hallmark cite any authority for the proposition that an individual has a right to "increased housing choices and supply." Where such a right would end, Hallmark does not explain. Recognizing a right to "increased housing choices and supply" would effectively place an affirmative duty on

24

governing bodies to approve all re-zoning applications wherein a developer sought to build housing within a particular price range. Furthermore, Hallmark's lunch counter analogy is flawed. Here, there is no evidence that South Fulton is currently segregated and that Hallmark's development would end that segregation. Therefore, there is no "segregated lunch counter" that the County is refusing to remedy. The District Court did not clearly err in finding that other affordable housing is available. This finding cuts against the accuracy of Dr. Bradford's opinion.

The District Court also rejected Dr. Bradford's testimony on the grounds that Hallmark's projected price ranges may not be the price at which the homes actually sell and the apartments actually rent. Hallmark argues correctly that the District Court's finding on this issue was partly speculative. Hallmark failed to meet its burden of demonstrating that the houses would actually sell and the apartments and townhomes would actually rent for the prices projected.

The District Court did not clearly err in refusing to credit the testimony of Dr. Bradford. We need not reach the issue of whether the District Court clearly erred in concluding that Dr. Bradford's testimony failed to establish that the disparity ratios were statistically significant.

## C

Hallmark challenges the District Court's decision to admit the testimony of Mr. Hammond. A decision to admit or exclude an expert's testimony is reviewed for abuse of discretion. *Cortes v. Am. Airlines, Inc.*, 177 F.3d 1272, 1305-06 (11th Cir. 1999). Hallmark argues that the District Court erred in failing to hold a *Daubert* hearing regarding Mr. Hammond's testimony and that Mr. Hammond's testimony was based on flawed methodology. We do not reach this issue because the District Court's judgment does not depend on the admissibility of Mr. Hammond's testimony.

**AFFIRMED**.