[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 12-15014

_____

D.C. Docket No. 0:10-cv-61122-JIC

CITY OF FORT LAUDERDALE,
a Florida Municipal Corporation,

> Plaintiff -
> Counter Defendant -
> Appellee,

versus

HEZZEKIAH SCOTT,

> Defendant -
> Counter Claimant -
> Appellant,

VIRGIL BOLDEN,
GLORIA BURNELL,
ESTATE OF WALTER TIRSCHMAN,
KAREN MCNAIR,

> Counter Claimants -
> Appellants,

ALFRED G. BATTLE, JR.,
Director of Community Redevelopment Agency,
in his official and individual capacities,

Counter Defendant - Appellee,

Shaun Donovan,
in his office capacity as Secretary of
the United States Department of
Housing and Urban Development, et al.,

Counter Defendants.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(January 3, 2014)

Before HULL and MARTIN, Circuit Judges, and HINKLE,[*] District Judge.

HINKLE, District Judge:

The City of Ft. Lauderdale has a code that addresses property maintenance. The City undertook a zero-tolerance campaign to clean up a blighted area. The overwhelming majority of the area's residents are African American. A group of African American property owners asserted in the district court that the City issued and enforced citations through procedures that violated the Due Process Clause, that the City intentionally discriminated against African Americans in violation of the Equal Protection Clause and Fair Housing Act, and that the City's actions had a

---

[*]Honorable Robert L. Hinkle, United States District Judge for the Northern District of Florida, sitting by designation.

2

disparate impact on African Americans in violation of the Fair Housing Act.  The district court granted summary judgment for the City.  The property owners have appealed, challenging only the Due Process and disparate-impact rulings.  We affirm.

## I

The City's code addresses a wide range of issues.  Violations include structural damage that could cause a house or other building to collapse and injure occupants, at one extreme, and leaving a garbage can at the street for too long after collection, at the other extreme.

The City has inspectors who enforce the code.  The process begins with issuance of an Inspection Report describing a violation.  If the property owner does not correct the violation, the inspector issues a Notice of Violation.  The Notice of Violation sets a time and place for a hearing before a special master.  At the hearing, the property owner may contest the violation.  The special master's decision is reviewable in Florida state court.

Liens accrue for uncorrected violations.  This could eventually lead to a judicial foreclosure action and, if the amount that is due is still not paid, to sale of the property to satisfy the lien.

## II

3

This case began when the City filed a foreclosure action in state court against Hezzekiah Scott based on liens resulting from multiple code violations. Mr. Scott, joined by three others who owned property that had been cited and the estate of a fourth, filed a counterclaim and eventually a second amended counterclaim. In addition to Mr. Scott, the counterclaimants were Virgil Bolden, Gloria Burnell, Karen McNair, and the Estate of Walter Tirschman.

The counterclaimants named the United States Department of Housing and Urban Development and its Secretary as additional counterclaim defendants. They removed the case to federal court. The claims against them were dismissed, but the case was not remanded.

The counterclaimants asserted three claims against the City that are significant here.

First, the counterclaimants asserted that the City's procedures violated the Due Process Clause because each initial Inspection Report falsely asserted that a violation could lead to the property owner's arrest and incarceration for up to 90 days. The counterclaimants asserted that the threat of arrest discouraged them from attending hearings to contest the alleged violations.

Second, the counterclaimants asserted that the City intentionally discriminated against African Americans in enforcing the code, including by undertaking a plan to foreclose on properties in a predominantly African American

4

area in northwest Ft. Lauderdale.  The goal of the plan, according to the counterclaimants, was to redevelop the area.  The counterclaimants asserted that the intentional racial discrimination violated the Equal Protection Clause and the Fair Housing Act, 42 U.S.C. §§ 3601-3619.

Third, the counterclaimants asserted that even aside from any intent to discriminate, the City's code-enforcement policies had a disparate impact on African Americans and that this, too, violated the Fair Housing Act.

The City moved for summary judgment.  The district court granted the motion.  The court concluded that the City's procedures complied with the Due Process Clause and that the counterclaimants had not shown intentional discrimination.  The court concluded that the counterclaimants had failed to adequately support their disparate-impact claim.

The counterclaimants have appealed.  They do not challenge the intentional-discrimination ruling.  But they do challenge the Due Process and disparate-impact rulings.

### III

We review de novo the district court's summary-judgment ruling.  As the district court was obligated to do, we must resolve all genuine evidentiary disputes, and draw all reasonable inferences, in favor of the counterclaimants, as the parties opposing summary judgment.

5

IV

The Due Process Clause applies to a city's deprivation of a person's property. The counterclaimants assert that imposing a lien on real property qualifies as a deprivation of property, even prior to any effort to enforce the lien. We decide the case on other grounds and thus do not address this issue.

Due process requires notice and an opportunity to be heard at a meaningful time in a meaningful manner. E.g., Armstrong v. Manzo, 380 U.S. 545, 552, 85 S. Ct. 1187, 1191 (1965); Catron v. City of St. Petersburg, 658 F.3d 1260, 1266 (11th Cir. 2011). The notice must be "reasonably calculated under all the circumstances" to apprise the person of the proposed action and to afford the person an opportunity to present objections. Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 314, 70 S. Ct. 652, 657 (1950).

Here, before any lien attached, the City issued a Notice of Violation to the property owner that specified the purported violation and set a time and place for a hearing before a special master. A hearing, had it been requested, would have afforded the property owner a right to be heard in full—to contest the violation. And judicial review would have been available. This is a paradigm of due process.

The counterclaimants do not contend otherwise. But they note that the Inspection Report that preceded the Notice of Violation falsely said a property owner could be arrested and jailed for up to 90 days based on a violation. Mr.

6

Scott has sworn that when he later received a Notice of Violation setting a hearing, the prior false threat of arrest discouraged him from attending a hearing to contest the violation.

The claim fails for lack of a sufficient connection between the Inspection Report's false statement and the later opportunity for a hearing. The Inspection Report did <u>not</u> say an arrest would occur at a hearing. The report made no connection at all between a hearing and an arrest. The Inspection Report did <u>not</u> say an arrest would occur if a violation was successfully challenged, or even if a violation was unsuccessfully challenged. And most importantly, the Notice of Violation itself—as distinguished from the earlier Inspection Report—did not refer at all to any possibility of arrest.

For summary-judgment purposes, we accept as true Mr. Scott's sworn assertion that he was dissuaded from attending a hearing by the Inspection Report's false statement about arrest. But the notice's subjective effect on a specific individual is not enough to show a due-process violation. To the contrary, a city complies with the Due Process Clause when it makes actual delivery of a notice that would be sufficient if delivered to a reasonable person in like circumstances, at least in the absence of a reason to know that, for the specific individual, the notice would somehow be insufficient. See <u>Jones v. Flowers</u>, 547 U.S. 220, 231 (2006) ("[T]he constitutionality of a particular procedure for notice

is assessed ex ante, rather than post hoc.").  Here each Notice of Violation provided all the information a reasonable person would need to obtain a hearing. A reasonable person who wished to contest the violation would have done so, notwithstanding the earlier, erroneous Inspection Report.  And the City had no reason to believe otherwise.

The City's process—consisting of a clear Notice of Violation, the right to a hearing before a special master, and the availability of judicial review—fully complied with the Due Process Clause.

V

The City undertook a zero-tolerance campaign in an area whose residents are predominantly African American.  The precise boundaries of the area and how long the campaign continued are disputed, but the fact of the campaign is not. During the campaign, the City directed its inspectors to cite every violation, no matter how trivial.  Inspectors cited violations that would not have been cited in other parts of the City.

The record includes no evidence that the inspectors treated African American residents differently from other residents of the targeted area.  But the targeting of the predominantly African American area had a greater overall impact on African Americans than on City residents of other races.  The record thus

8

establishes, or at least would support a finding, that the campaign had a disparate impact on African Americans.

There are four steps in the analysis of whether this disparate impact entitles these counterclaimants to prevail on this appeal.

First, the counterclaimants assert, and the City has not contested, that the Federal Housing Act applies not just to intentional racial discrimination but also to conduct with an unjustified racially disparate impact. See, e.g., Hallmark v. Developers, Inc. v. Fulton Cnty., Ga., 466 F.3d 1276, 1286 (11th Cir. 2006); Jackson v. Okaloosa Cnty., Fla., 21 F.3d 1531, 1543 (11th Cir. 1994).

Second, the counterclaimants assert that the Fair Housing Act applies to code enforcement activities leading to the imposition of liens that could result in foreclosures. The City did not assert the contrary in the district court and has not done so on appeal. We thus have no occasion to address this issue on the merits; for present purposes, we assume without deciding that the counterclaimants are correct.

Third, conduct covered by the Fair Housing Act that has a racially disparate impact does not always violate the Act. Instead, when conduct has a racially disparate impact, the conduct nonetheless comports with the Act so long as the conduct has a legitimate nondiscriminatory goal and the goal cannot feasibly be achieved by means having a less-disparate impact. See Huntington Branch,

9

NAACP v. Town of Huntington, 844 F.2d 926, 936 (2d Cir.1988), aff'd in part sub nom. Town of Huntington, N.Y. v. Huntington Branch, NAACP, 488 U.S. 15, 109 S. Ct. 276 (1988).  The record shows that a goal of the City's zero-tolerance campaign was to clean up a blighted area.  That the area was predominantly African American did not mean the City could not attempt to clean it up, including—in the absence of a feasible alternative with a less-disparate impact— through a zero-tolerance campaign.  But the City did not offer this as a basis for summary judgment, either in the district court or on appeal.  We thus have no occasion to decide the issue.

Fourth, an individual counterclaimant can prevail on a disparate-impact claim only by showing that the challenged conduct affected the individual counterclaimant.  An effect on others in the neighborhood is not enough.  The counterclaimants have failed to show the required individual effect.  Accord In re Employment Discrimination Litig. Against State of Ala., 198 F.3d 1305, 1315-16 (11th Cir. 1999) (noting that—even if the employer's employment practice resulted in a disparate impact in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq.—a plaintiff still must prove individual harm).

Thus, for example, inspectors cited Mr. Scott for a long list of violations.  One was leaving a garbage can at the curb after service.  Inspectors testified that they enforced violations in the targeted northwest area that they did not enforce in

10

the rest of the City.  A reasonable inference is that leaving out a garbage can was one of those violations.  But Mr. Scott's other violations were more substantial.  His building and fence were generally in disrepair, trash and debris were scattered on the property, ground cover was missing or overgrown, and derelict vehicles were on the property.  There is no evidence that violations this extensive would have been tolerated or treated more favorably in other parts of the City.

Mr. Scott did not pay the associated fines.  He eventually lost his property not from foreclosure of the resulting liens but in a tax sale resulting from his failure to pay ad valorem taxes.  Still, Mr. Scott has sworn, and we accept as true, that he stopped paying the taxes because of the likelihood that he would lose the property from foreclosure of the liens.  Even so, there is no evidence or reason to infer that the result would have been different had Mr. Scott been cited only for the substantial violations—the ones that apparently would have been cited elsewhere in the City—and not for the garbage-can violation.  In short, the record includes no evidence that would support a finding that Mr. Scott lost his property because of the zero-tolerance campaign rather than only as a result of violations that would have produced the same result anywhere in the City.

The same is true for Mr. Bolden, Mr. Tirschman, and Ms. Burnell.  All were cited for extensive violations.  Indeed, Ms. Burnell was cited for serious structural violations that eventually led to destruction of her buildings.  There is no evidence

11

that violations of this nature would have been tolerated or treated more favorably anywhere in the City.

Ms. McNair was cited for no violations at all after settling a claim against the City arising from earlier violations.  Because of the settlement, Ms. McNair cannot pursue a claim based on the earlier violations.  She asserted in the district court that the City violated the settlement agreement, but she has not pursued that claim on appeal.

The bottom line is this.  The record includes no evidence that the City's zero-tolerance campaign made any actual difference for these counterclaimants.  They are not entitled to prevail on the disparate-impact claim.

## VI

The district court properly entered summary judgment for the City on all claims.  The judgment is **AFFIRMED**.