Filed 11/25/20

CERTIFIED FOR PUBLICATION


COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| LUZ VILLAFANA et al., | D076120 |
| Plaintiffs and Appellants, | |
| v. | (Super. Ct. No. 37-2018-00031741-CU-MC-CTL) |
| COUNTY OF SAN DIEGO, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of San Diego County, Ronald L. Styn, Judge. Affirmed.

ACLU Foundation of San Diego & Imperial Counties, David Loy, Jonathan Markovitz, Melissa Deleon; Fish & Richardson, Aleksandr Gelberg, Madelyn S. McCormick and Geuneul Yang, for Plaintiffs and Appellants.

Thomas E. Montgomery, County Counsel, and Thomas D. Bunton, Assistant County Counsel, for Defendant and Respondent.

Plaintiffs filed a first amended complaint (FAC) alleging discrimination under Government Code[1] section 11135 based on its requirement that all San Diego County (the County) applicants eligible for the state's CalWORKs

---

1    Further undesignated section references are to the Government Code.

(welfare) program participate in a home visit. The County demurred, arguing there was no discriminatory effect of the program, there was no disparate impact caused by the home visits, and the parties lacked standing to sue. The superior court granted the demurrer without leave to amend and entered judgment. Plaintiffs argue on appeal that the FAC states a viable cause of action. We disagree. Because the FAC does not allege a disparate impact on a protected group of individuals and cannot be amended to do so, we will affirm.

BACKGROUND AND PROCEDURAL FACTS

In June 2018, Luz Villafana and Uhmbaya Laury[2] filed a complaint for injunctive and declaratory relief against the County alleging the County's implementation of the state-funded California Work Opportunity and Responsibility to Kids (CalWORKs) program disproportionately impacted people of color and women.

The County demurred, and the court sustained the motion with leave to amend. Plaintiffs filed the FAC December 7, 2018.

The FAC explained CalWORKs provides a safety net for anyone who becomes income-eligible due to a job loss or otherwise, based on a net monthly family income of no more than $1,292. It alleged that under the County's regulations, applicants are required to participate in a face-to-face interview before aid will be granted even though state regulations require a home visit only if factors affecting eligibility, including living arrangements, cannot be satisfactorily determined. The County calls these home visits Project 100% (P100).

---

[2]    Villafana brought suit as a tax payer. Laury brought suit as an individual who had applied for and received public benefits under the CalWORKs program, and who suffered "adverse impacts" from the home visit policy.

The home visits are conducted by licensed peace officers who currently are assigned to the Public Assistance Fraud division of the Department of Child Support Services.[3] The peace officer makes an unannounced visit to the address the applicant lists on the application, and, if no one is home, the investigator leaves a business card. Following a second attempt, the investigator leaves a note for the applicant to call the investigator. Applicants believe they must remain at home while waiting for the visit. If the attempts to contact the applicant are unsuccessful or the applicant declines to participate in the home visit, the application is denied. The home visit can include an inspection of an applicant's home, including closets, cupboards, desks, hampers, and laundry bags.

The FAC alleged that because the home visits are unannounced, applicants often remain confined to their homes waiting for a visit, and this may require them to postpone job searches, skip medical appointments, or stop taking children to school out of fear they will miss the investigator's unannounced visit. Applicants also experience stress and anxiety waiting for an investigator to conduct the unannounced home visit, fearing their application will be denied if they are not home when the investigator visits. Additionally, the FAC alleged the home visit requirement is embarrassing, stigmatizing, and traumatizing, because it treats applicants as suspected criminals and attracts the attention of neighbors, signaling the applicant is in trouble with law enforcement or needs public assistance.

The FAC further alleged that 50.33 percent of the County's CalWORKs recipients are Hispanic, and 14.11 percent are African American in contrast to the general population, which is 33.5 percent Hispanic and 5.5 percent

---

[3] The County separately investigates individuals suspected of having committed welfare fraud, but that is not a subject of the action.

3

African American.  Additionally, while women represent 72.73 percent of enrollees in the CalWORKs Welfare-to-Work program, women represent only 39 percent of the general population.[4]

Finally, the FAC alleged the policy of conducting home visits for every applicant violates Government Code section 11135 and Code of Civil Procedure section 526a because the practice discriminates against protected groups and substantially impairs the accomplishment of the CalWORKs program objectives with respect to individuals in the protected classes.

The County demurred a second time, arguing home visits could not be the facially neutral practice and also constitute the adverse impact, there was no allegation of a disparate impact on women and minorities, and the plaintiffs lacked standing to sue.  Plaintiffs responded that the adverse impact of stigma resulted from the visit and fell disproportionately on a protected population when CalWORKs applicants are compared to those who do not apply for CalWORKs benefits.

The court sustained the demurrer to the FAC without leave to amend on March 22, 2019.  It granted the demurrer on the basis that the neutral practice could not be the adverse impact, and there were no allegations the home visit placed a significantly harsher burden on a protected group of CalWORKs recipients because the allegations of stress, anxiety, and stigma applied equally to all CalWORKs applicants.

Judgment was entered April 8, 2019.  Plaintiffs timely appealed.

---

[4]    The FAC alleged on information and belief that the Welfare-to-Work program numbers reflect the demographics of CalWORKs recipients more broadly because nearly all CalWORKs recipients are required to participate in Welfare-to-Work.

## DISCUSSION

### A. Legal Principles

"On appeal from an order of dismissal after an order sustaining a demurrer, the standard of review is de novo: we exercise our independent judgment about whether the complaint states a cause of action as a matter of law." (*Stearn v. County of San Bernardino* (2009) 170 Cal.App.4th 434, 439.) We evaluate whether a cause of action has been stated under any legal theory. (*Curcini v. County of Alameda* (2008) 164 Cal.App.4th 629, 637.) In making our determination, we admit all facts properly pleaded (*Aubry v. Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 967 (*Aubry*)); we " 'give the complaint a reasonable interpretation, reading it as a whole and its parts in their context' " (*Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 38). We read the allegations "in the light most favorable to the plaintiff and liberally construed with a view to attaining substantial justice among the parties." (*Venice Town Council v. City of L.A.* (1996) 47 Cal.App.4th 1547, 1557.)

If the pleading is insufficient on any ground specified in a demurrer, we will uphold the order sustaining it, even if it is not the ground relied upon by the trial court. (*Sheehan v. San Francisco 49ers, Ltd.* (2009) 45 Cal.4th 992, 998.) We review the trial court's refusal to grant leave to amend under the abuse of discretion standard. (*Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1126 (*Zelig*); *Aubry*, *supra*, 2 Cal.4th at p. 967.)

## B. Disparate Impact Theory

The FAC alleged P100 violates Government Code section 11135, subdivision (a),[5] which prohibits denial of full and equal access to benefits of a state-funded program and prohibits discrimination under any state-operated program, because the home visits are embarrassing, stigmatizing, and traumatizing. Assuming the harm identified in the FAC qualifies as an actionable discriminatory impact, we conclude that because plaintiffs have not and cannot allege a significantly harsher burden on protected groups than non-protected groups as result of P100, the FAC fails to state a claim.

Under disparate impact law, "(1) a plaintiff establishes a prima facie case if the defendant's facially neutral practice causes a disproportionate adverse impact on a protected class; (2) to rebut, the defendant must justify the challenged practice; and (3) if the defendant meets its rebuttal burden, the plaintiff may still prevail by establishing a less discriminatory alternative." (*Darensburg v. Metro. Transp. Comm'n* (9th Cir. 2011) 636 F.3d 511, 519 (*Darensburg*).)[6] In establishing a claim, the plaintiffs must plead facts that establish a facially neutral policy or practice that causes a disproportionate harm to persons in a protected class. (*Comm. Concerning Cmty. Improvement v. City of Modesto* (9th Cir. 2009) 583 F.3d 690, 711.)

However, the mere fact that each person affected by a practice or policy is also a member of a protected group does not establish a disparate impact.

---

[5] Governing regulations also prohibit using criteria or any methods of administration that have the effect of subjecting someone to discrimination or that defeat or substantially impair the program's objectives. (Cal. Code Regs., tit. 2, § 11154(i).)

[6] Federal law "provides important guidance in analyzing state disparate impact claims." (*Darensburg, supra*, 636 F.3d at p. 519; see also *Guz v. Bechtel National Inc.* (2000) 24 Cal.4th 317, 354 [California courts look to federal precedent in applying California employment discrimination laws].)

(*Carter v. CB Richard Ellis, Inc.* (2004) 122 Cal.App.4th 1313, 1324, citing *Katz v. Regents of the University of California* (9th Cir. 2000) 229 F.3d 831.) To make out a prima facie case of disparate impact, a plaintiff must employ an appropriate comparative measure. (*Darensburg, supra,* 636 F.3d at p. 519.) "An appropriate statistical measure must . . . take into account the correct population base and its racial makeup." (*Id.* at p. 520.) There is no prima facie case when the wrong base population is used in the statistical sample. (*Robinson v. Adams* (9th Cir. 1987) 847 F.2d 1315, 1318.) "[T]he appropriate inquiry is into the impact on the total group to which a policy or decision applies." (*Hallmark Developers, Inc. v. Fulton County* (11th Cir. 2006) 466 F.3d 1276, 1286.)

Central to plaintiffs' claim is that the alleged psychological harms of the P100 program falls disproportionately on classes protected by section 11135 when comparing CalWORKs applicants subject to home visits with the general population of the County. The County contends that to properly assess whether the harm caused by home visits has a disparate impact on protected classes, the comparison must be among those who receive the visits because that is the group to which the facially neutral practice applies. And because all CalWORKs recipients are affected equally, the FAC fails to state a claim. Moreover, because the FAC acknowledges that all CalWORKs applicants are harmed the same by home visits, plaintiffs cannot amend the complaint to successfully make a disparate impact claim. We agree with the County; the appropriate comparison is between groups to whom the facially neutral policy has been or can be applied. (See *Darensburg, supra,* 636 F.3d at p. 520; *County Inmate Telephone Service Cases* (2020) 48 Cal.App.5th 354, 368 (*Inmate Telephone Service Cases*)

[analyzing impact of telephone services on the inmate population affected by policy rather than general population].)

To support their theory of proper comparison groups, plaintiffs point to disparate impact cases predominantly in the housing context. (See *Sisemore v. Master Financial, Inc.* (2007) 151 Cal.App.4th 1386, 1421 [home loan]; *Jackson v. Okaloosa County* (11th Cir. 1994) 21 F.3d 1531, 1543 [housing construction bidding policy]; *Huntington Branch, NAACP v. Huntington* (2d Cir 1988) 844 F.2d 926, 938 (*Huntington Branch*) [zoning]; *Metropolitan Housing Dev. Corp. v. Village of Arlington Heights* (7th Cir. 1977) 558 F.2d 1283, 1288 (*Metropolitan Housing*) [zoning]; *Green v. Sunpointe Associates, Ltd.*, (W.D. Wash. May 12, 1997, No. C96-1542C) [1997 WL 1526484, at p. *6] [Section 8 housing].) These cases challenged zoning, construction, home loan practices, and rental decisions under the Fair Housing Act (42 U.S.C. § 3601 et seq.), which, like section 11135, prohibits discrimination. However, the legislative goals of the Fair Housing Act make it an inapt analogy for the case before us.

In addition to prohibiting discrimination, the Fair Housing Act aims to promote integrated housing patterns and prevent the increase of segregation in the general population. (*Trafficante v. Metropolitan Life Ins. Co.* (1972) 409 U.S. 205, 211 [Fair Housing Act intended to integrate neighborhoods and directly impact the whole community]; *Huntington Branch, supra*, 844 F.2d at pp. 937-938 [refusal to permit projects reinforced racial segregation]; *Metropolitan Housing, supra*, 558 F.2d at pp. 1288-1289 [zoning regulation perpetuated racial segregation].) In *Metropolitan Housing*, the Seventh Circuit explained that "[c]onduct that has the necessary and foreseeable consequence of perpetuating segregation can be as deleterious as purposefully discriminatory conduct in frustrating the national commitment

8

'to replace the ghettos "by truly integrated and balanced living patterns." ' " (*Metropolitan Housing*, at p. 1289.)  In other words, the law was intended to impact those who fall within protected classes, and it was also intended to impact the broader population.  Accordingly, a housing decision that prevented integration impacted the entire community, not just those explicitly seeking integrated housing options.  Thus, in those cases, the demographic statistics within the general population could serve as an appropriate measure for comparison.

The plaintiffs attempt to paint the CalWORKs program as similarly benefitting society, arguing that because welfare offers a safety net for all members of society, the comparison group must include the entire population, including those who could potentially participate in the future though not presently eligible.  While we recognize that welfare benefits can "foster the dignity and well-being of all persons" because it helps guard against "the societal malaise that may flow form a widespread sense of unjustified frustration and insecurity" (*Goldberg v. Kelly* (1970) 397 U.S. 254, 264-265), this is not the same as the direct benefit intended by the desegregation goals of the Fair Housing Act.  Welfare benefits are not distributed with the express aim of affecting those who do not qualify for them in the same way that the Fair Housing Act does.

Although not a perfect analogy, the line of cases addressing titles VI and VII of the Civil Rights Act (42 U.S.C. §§ 2000d et seq. & 2000e et. seq.) offers a more apt comparison.  In the employment context, courts consider whether an "an employment practice selects members of a protected class in a proportion smaller than their percentage in the pool of actual applicants, or, in promotion and benefit cases, in a proportion smaller than in the actual pool of eligible employees." (*Moore v. Hughes Helicopters, Inc., Div. of*

9

*Summa Corp.* (9th Cir. 1983) 708 F.2d 475, 482; *Hazelwood School Dist. v. United States* (1977) 433 U.S. 299, 308 [comparison should be between composition of those filling at-issue jobs and composition of population in relevant labor market]; *Harris v. Capital Growth Investors XIV* (1991) 52 Cal.3d 1142, 1171 [compare composition of representation of protected class in work force against qualified population in labor force]; *Hall v. County of Los Angeles* (2007) 148 Cal.App.4th 318, 324 [regarding equal pay between men and women]; *Stout v. Potter* (9th Cir. 2002) 276 F.3d 1118, 1122; *Robinson v. Adams*, *supra*, 847 F.2d at p. 1318 [explaining general population is not a proxy for a pool of potential applicants when the positions require special skills].)

In the employment context, courts consider the percentage of individuals within a protected class that should advance and compare that to the number of individuals who actually advance. The difference in those numbers can demonstrate the harm arising from the disparate impact. Plaintiffs here do not claim denial of the CalWORKs benefit is a harm. In that sense, employment cases do not offer an ideal analogy because they focus on denial of the employment benefit, not stigma from the hiring or promotion process. However, because the issues in both contexts can reasonably impact only a subset of the general population—those qualified for positions in the employment context and those eligible for CalWORKs benefits here—we are satisfied that the employment cases provide adequate guidance for the issue before us. Just as the entire county population may not be eligible for a particular job, neither is the entire county population eligible for CalWORKs benefits. Thus, comparing CalWORKs applicants and the general population of the county ignores the basic principal that comparators be similarly situated. (See *Inmate Telephone Service Cases*, *supra*, 48 Cal.App.5th

10

at p. 368; *Darensburg*, *supra*, 636 F.3d at pp. 519-520.) The appropriate statistical comparison asks whether the home visits disproportionately harm women, Hispanic, and African American applicants when compared to the entire population of applicants.

Plaintiffs' FAC alleges that the P100 home visit requirement is embarrassing, stigmatizing, and traumatizing.[7] However, plaintiffs fail to allege that Hispanic, Latino, or female applicants suffer harsher impacts than other groups to whom the practice is applied. Because all applicants are subject to the home visits, and plaintiffs allege these visits cause a dignitary harm, there is no viable disparate impact claim, and the court's grant of the demurrer without leave to amend did not abuse its discretion. (See *Zelig*, *supra*, 27 Cal.4th at p. 1126; *Aubry*, *supra*, 2 Cal.4th at p. 967.)

---

[7] The parties dispute whether the home visit requirement can properly be characterized as treating applicants as suspected criminals in light of *Sanchez v. County of San Diego* (9th Cir. 2006) 464 F.3d 916, 918, a case in which the Ninth Circuit concluded the home visits required by P100 were not searches under the Fourth Amendment and were otherwise reasonable and held the home visit requirement did not violate the state or federal constitution or California's welfare regulations. We do not wade into this dispute because, absent a statistical comparison that can demonstrate disparate impact, we need not evaluate the viability of these "dignitary injuries" as evidence of harmful impact envisioned by section 11135.

11

DISPOSITION

The judgment is affirmed.  Costs are awarded to Respondent.


                                                  HUFFMAN, J.

WE CONCUR:



McCONNELL, P. J.



IRION, J.

12